

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-14-2008

# USA v. Jimenez

Precedential or Non-Precedential: Precedential

Docket No. 05-4098

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"USA v. Jimenez" (2008). *2008 Decisions.* Paper 1652.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/1652

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Case Nos: 05-4098, 05-4099, 05-4106, 05-4107, 05-4157


UNITED STATES OF AMERICA

v.

FERNANDO JIMENEZ,
    Appellant in Case No: 05-4098


UNITED STATES OF AMERICA

v.

ANA MARTELL,
    Appellant in Case No: 05-4099


UNITED STATES OF AMERICA

v.

KATHY GIUNTA,
    Appellant in Case No: 05-4106

UNITED STATES OF AMERICA

v.

LUIS NIEVES,
Appellant in Case No: 05-4107


UNITED STATES OF AMERICA

v.

RENE ABREU,
Appellant in Case No: 05-4157

_____

On Appeal from the United States District Court
for the District of New Jersey
District Court No.: 02-cr-00337
District Judge: The Honorable Joseph A. Greenaway, Jr.
_____

Argued April 10, 2007

2

Before: SMITH, NYGAARD, and HANSEN,[*]
*Circuit Judges*

(Filed: January 14, 2008)

Counsel:
David W. Fassett, Esq. (argued)
Arseneault Fassett & Mariano, LLP
560 Main Street
Chatham, NJ 07928
*Counsel for Appellant Fernando Jimenez*

Timothy M. Donohue, Esq.
Arleo & Donohue, L.L.C.
622 Eagle Rock Avenue
Penn Federal Building
West Orange, NJ 07052
*Counsel for Appellant Ana Martell*

Alain Leibman, Esq.
Stern & Kilcullen
75 Livingston Avenue
Roseland, NJ 07068
*Counsel for Appellant Kathy Giunta*

---

[*]The Honorable David R. Hansen, Senior Circuit Judge of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

Brian J. Neary, Esq.
190 Moore Street
Hackensack, NJ 07601
*Counsel for Appellant Luis Nieves*

Gerald Krovatin, Esq. (argued)
Krovatin & Associates, LLC
744 Broad Street, Suite 1903
Newark, NJ 07102
*Counsel for Appellant Rene Abreu*

Christopher J. Christie, Esq.
George S. Leone, Esq.
Glenn J. Moramarco, Esq. (argued)
United States Attorney Office
970 Broad Street
Newark, NJ 07102-2535
*Counsel for Appellee*

_____

OPINION

_____

HANSEN, *Circuit Judge*.

At the conclusion of a three-and-a-half month jury trial, Fernando Jimenez, Ana Martell, Kathy Giunta, Luis Nieves, and Rene Abreu were each convicted of one or more counts of a 47-count superceding indictment stemming from eight related

conspiracies involving *inter alia* mortgage fraud and bank fraud. The Appellants each appeal their convictions and sentences in this consolidated appeal. We will affirm.

## I. Background

After a jury verdict, we review the facts in the light most favorable to the verdict. Rene Abreu owned and/or controlled several companies related to the real estate industry. Mortgage Pros, Inc. was a mortgage brokerage company that secured residential and commercial loans from financial institutions for clients attempting to buy a house or commercial property; Abreu Real Estate was a realty company; and RLA Homes, Inc. managed the development, construction, and sale of realty.

Fernando Jimenez and Kathy Giunta worked for Mortgage Pros as loan processors. Ana Martell was the bookkeeper for Mortgage Pros as well as for other of Abreu's companies. Many of Mortgage Pros' customers lacked sufficient income, assets, or employment history to qualify for a residential mortgage. When customers failed to qualify for a mortgage, Martell, at Abreu's direction, fabricated federal tax returns, inflated the income listed on existing W-2 forms, or provided false pay stubs for the customer. Martell, Jimenez, and Giunta each participated in completing false forms needed to qualify the customer for a mortgage, including Verification of Employment (VOE) forms, HUD-1 settlement statements, and sales contracts. Mortgage Pros charged and received a fee, generally paid in

5

cash, in exchange for providing the false documents. The creation of false documents was common knowledge among the Mortgage Pros employees, many of whom assisted on occasion in destroying records at Abreu's direction.

Some of Mortgage Pros' customers, who relied on the false documentation to obtain a mortgage they could not afford, eventually defaulted on their mortgages and lost their homes, resulting in losses to the lenders as well. The indictment charged Abreu, Martell, Jimenez, and Giunta with conspiring to commit, and committing, mail fraud for submitting via the mail false loan applications related to the residential mortgage loan fraud scheme, which occurred between November 1992 and July 1997. They each were convicted by the jury of the conspiracy charge. Various members of the conspiracy were charged with numerous substantive mail fraud counts based on particular loan files. The jury returned convictions on most of the substantive counts, but acquitted on some of those counts.

The commercial mortgage fraud conspiracy operated in a manner similar to the residential mortgage fraud conspiracy and allegedly involved Abreu, Martell, Giunta, and Luis Nieves, who was a senior vice-president in the commercial loan department at Hudson United Bank (HUB). Nieves managed Abreu's commercial accounts at HUB. Abreu, Martell, and Giunta submitted commercial loan applications containing false and forged information for Mortgage Pros' commercial customers as well as for Abreu's own companies. Nieves

6

approved the commercial loan applications, allegedly acting with the knowledge that the documentation contained false information. The jury convicted Abreu, Martell, and Giunta of the conspiracy and the substantive mail fraud charges related to the commercial loan conspiracy but acquitted Nieves of those charges.

The bank fraud conspiracy charge stems from a check kiting scheme carried on by Abreu and his employees involving several accounts maintained by Abreu's companies with HUB. Abreu transferred large amounts of money between his 30 accounts at HUB by writing checks from one account to another. Nieves, as senior vice-president of the commercial department at HUB, authorized HUB to cover Abreu's overdrafts, and routinely allowed Abreu to cover an overdraft in one account with a check drawn on another HUB account that likewise lacked sufficient funds to cover the check. Nieves also approved overdrafts that exceeded the amount he was authorized to approve. During a one-year period, there were 280 days in which an overdraft existed in at least one of Abreu's accounts that exceeded $500,000; on 21 days during that time frame, the overdraft exceeded $1 million.

HUB's upper management reviewed reports generated by HUB's computer system that reported any individual account with a negative balance of at least $5,000 that remained overdrawn for more than five days. Martell carried out the check kiting scheme, writing the checks between accounts and

7

ensuring the money moved between accounts in a timely manner so as to avoid detection on HUB's 5-day overdraft management report. HUB's executive vice-president learned of the overdrafts in June 2001, and he contacted Abreu about the $1.3 million overdraft that existed on June 15, 2001. It took Abreu until July 9, 2001, to repay the full overdraft amount, much of which came from HUB's actions of applying funds from Abreu-related accounts to the overdraft balance. The jury found Abreu, Martell, and Nieves each guilty of the bank fraud conspiracy charge, which lasted from April 1996 through June 2001.

Abreu, Martell, and Giunta were also charged with conspiring to structure cash transactions to avoid the bank's filing of currency transaction reports, required for transactions of $10,000 or more in cash. Over a five-year period, Abreu deposited over $2 million in cash in various accounts held at HUB, with no single deposit exceeding $10,000. Martell and Giunta also deposited cash into their personal accounts and wrote corresponding checks to Abreu. All three were convicted of the conspiracy charge and some of the substantive structuring charges.

Following the jury verdict, the defendants filed a joint motion for a judgment of acquittal or, in the alternative, a new trial. The district court denied both motions.[1]

---

[1]Other counts involving a money laundering conspiracy, an extortion conspiracy, and a tax fraud conspiracy were either

Abreu was convicted of 20 counts and was sentenced to 87 months of imprisonment. He raises the following issues on appeal: 1) the district court's refusal to remove a juror for cause; 2) whether bank fraud premised on check kiting requires the involvement of more than one bank; 3) jury instructions related to the check kiting count; 4) the district court's limitations on cross-examination; 5) whether documentary evidence introduced against him violated the Confrontation Clause or the Federal Rules of Evidence; and 6) the reasonableness of his sentence.

Jimenez was charged in only two of the 47 counts in the superceding indictment and was convicted of both. He was sentenced to six months of imprisonment. On appeal, he challenges: 1) the district court's refusal to sever his trial from the other codefendants; 2) the sufficiency of the evidence to support the substantive mail fraud count; 3) evidentiary rulings; 4) alleged prosecutorial misconduct; and 5) he joins the arguments advanced by the other Appellants as applicable to him, particularly Abreu's juror challenge and the challenge to the documentary evidence.

Martell was convicted of eleven counts and was sentenced to 30 months of imprisonment. She joins each of the issues raised by Abreu and separately appeals the district court's

dismissed by the court or resulted in acquittal following the jury trial. None of these counts are relevant to this appeal and are not discussed herein.

calculation of her sentence.

Giunta was convicted of twelve counts. She was sentenced to 24 months of imprisonment and ordered to pay $499,563.27 in restitution to several banks. On appeal, she joins Abreu's arguments related to the district court's refusal to strike a juror for cause and the Confrontation Clause and evidentiary issues related to the documentary evidence. She also appeals her sentence.

Nieves was convicted of one count of conspiracy to commit bank fraud. He was sentenced to 40 months of imprisonment and fined $10,000. On appeal, he joins Abreu's arguments related to: the district court's refusal to strike a juror for cause; whether the conduct involved violated the bank fraud statute; the jury instructions related to the bank fraud count; Confrontation Clause and evidentiary rulings; and the limitations imposed on cross-examination. He also appeals his sentence as unreasonable.

## II. Common Challenges on Appeal

### A.     Refusal to Strike a Juror for Cause

The Appellants each challenge the district court's refusal to strike a prospective juror for cause. On the fourth day of jury selection, Jimenez's attorney brought to the district court's attention an "incident" that had occurred earlier that morning in

the women's restroom, in which Juror 14 exhibited what Jimenez's attorney believed to be an aggressive attitude toward her about who was next in line. During the subsequent voir dire of Juror 14, she was asked about inconsistent answers that she had given on her juror questionnaire regarding the presumption of innocence. Upon further questioning by the district court, the court was satisfied that Juror 14 would correctly hold the Government to its burden of proof and consider the defendants innocent until that burden was met. The court refused the defendants' request to strike Juror 14 for cause. The defendants ultimately used one of their peremptory strikes to dismiss Juror 14 and used all of their peremptory strikes on remaining jurors.

We review the district court's decision concerning whether to seat a juror for an abuse of discretion. *See United States v. Lopez*, 271 F.3d 472, 489 (3d Cir. 2001), *cert. denied*, 535 U.S. 908 (2002). "Determining whether a prospective juror can render a fair verdict lies peculiarly within a trial judge's province. . . . Therefore, the trial court's resolution of such questions is entitled, even on direct appeal, to special deference." *United States v. Murray*, 103 F.3d 310, 323 (3d Cir. 1997) (internal marks and citations omitted). The district court questioned the juror extensively about her understanding of the burden of proof and the presumption of innocence and ultimately allowed the defense attorneys to conduct voir dire concerning the bathroom incident, despite the district court's conclusion that the incident was inconsequential.

11

Given the deference afforded the district court, we cannot say that the district court abused its discretion in refusing to strike Juror 14 for cause. Further, the defendants were granted four extra peremptory strikes than those provided under Federal Rule of Criminal Procedure 24(b), they had two strikes remaining after they used one to strike Juror 14, and they have offered no evidence that the jury that was ultimately seated was biased. Even if Juror 14 should have been excused for cause, the defendants suffered no Rule violation or Due Process violation. *See United States v. Martinez-Salazar*, 528 U.S. 304, 307 (2000) ("[I]f the defendant elects to cure [the district court's error in refusing to dismiss a juror for cause] by exercising a peremptory challenge, and is subsequently convicted by a jury on which no biased juror sat, he has not been deprived of any rule-based or constitutional right."); *United States v. Powell*, 226 F.3d 1181, 1186 (10th Cir. 2000) (holding that the defendant suffered no rule or due process violation as to a particular prospective juror that should have been excused for cause where defendant used his last peremptory strike to remove that juror), *cert. denied*, 531 U.S. 1166 (2001).

## B.    Bank Fraud Conviction

Abreu, Martell, and Nieves, the three appellants convicted of conspiring to commit bank fraud under count 14 of the superceding indictment, challenge the district court's denial of their motion for a judgment of acquittal on the 18 U.S.C. § 1344 conviction, contending that a check kiting scheme

12

necessarily requires kiting between at least two banks. A motion for judgment of acquittal should be denied if, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005). We review the district court's denial of the motion *de novo*. *Id.*

Section 1344(1) makes criminal the "knowing[] execut[ion of], or [the] attempt[] to execute, a scheme or artifice to defraud a financial institution." There is no dispute that check kiting, that is, "[t]he illegal practice of writing a check against a bank account with insufficient funds to cover the check, in the hope that the funds from a previously deposited check will reach the account before the bank debits the amount of the outstanding check," Black's Law Dictionary 231 (7th ed. 1999), violates the bank fraud statute, *see, e.g., United States v. Geevers*, 226 F.3d 186 (3d Cir. 2000). The issue we address today is essentially a legal question: whether a check kiting scheme involving only one bank, where the defendant moves funds between various accounts at that institution, violates the bank fraud statute.

We agree with the defendants that this case does not involve a "typical" check kiting scheme, which generally involves moving funds between two or more banks, allowing the account holder to play the float. But § 1344 does not criminalize only typical check kiting schemes. The statute is

13

broad and includes any scheme to defraud a federally insured financial institution. *See United States v. Leahy*, 445 F.3d 634, 646 (3d Cir. 2006) ("The purpose of the bank fraud statute is to protect the financial integrity of [banking] institutions . . . [and] to fill gaps existing in federal jurisdiction over frauds in which the victims are financial institutions that are federally created, controlled or insured." (internal marks and citation omitted)). We focus then on whether the defendants' actions in this case amounted to a scheme to defraud a financial institution.

"[W]here the bank is a direct target of the deceptive conduct or scheme, § 1344 is satisfied by proof of a specific intent to defraud the bank plus fraudulent conduct (e.g., misrepresentations) which creates an actual loss or a risk of loss." *Id.* The fraudulent nature of a typical check kiting scheme has been described as thus:

> By depositing in one account checks drawn on other insufficiently funded accounts, the offender in a check-kiting scheme tricks two or more banks into inflating account balances and honoring bad checks. In effect, the offender writes himself a series of unauthorized, unsecured, and interest-free "loans," which may or may not be repaid. His actions put the banks at risk for the amount of the insufficient funds and deprive the banks of their assets by placing the unauthorized funds at the disposal of the check kiter.

14

*United States v. Flowers*, 55 F.3d 218, 219 n.1 (6th Cir.), *cert. denied*, 516 U.S. 901 (1995); *see also United States v. Shaffer*, 35 F.3d 110, 114 (3d Cir. 1994) (describing a check kiting scheme as "the borrowing of funds without authorization from the bank").

The fact that the scheme here involved various accounts at only one bank does not change the fraudulent nature of the scheme. Abreu controlled approximately 30 commercial accounts at HUB, and Martell, at Abreu's direction, maintained an elaborate system of writing large checks between the various accounts to cover overdrafts, thereby creating an overdraft in the account upon which the check was written, and in effect taking an unauthorized loan from HUB. Martell structured the transactions to avoid the bank's system for tracking substantial overdrafts and the resulting reports that were reviewed by upper management. Nieves contributed to the scheme by knowingly approving the overdrafts against bank policy.

The fact that the scheme involved only one bank does not take it out of the bank fraud statute, as long as the elements of bank fraud are satisfied. We agree with the Seventh Circuit that "[w]hile a 'traditional' check kiting scheme may involve multiple banks, § 1344(1) does not simply ban traditional check kiting. Instead, the statute prohibits any recognizable scheme formed with the intent to defraud." *United States v. Norton*, 108 F.3d 133, 135 (7th Cir.) (internal marks and citations omitted) (affirming a bank fraud conviction where the perpetrator of a

15

check kiting scheme used an unrelated ATM machine to deposit checks into a single account), *cert. denied*, 522 U.S. 816 (1997); *see also United States v. Swanson*, 360 F.3d 1155, 1163 (10th Cir. 2004) (affirming a bank fraud conviction involving eleven accounts at a single bank); *United States v. Yarmoluk*, 993 F. Supp. 206, 209 (S.D.N.Y. 1998) (denying motion to withdraw a guilty plea where check kiting between five linked accounts in one bank provided the factual basis to support a bank fraud conviction), *aff'd by* 172 F.3d 39 (2d Cir. 1999) (unpublished).

The Government must also establish that the defendants' actions put the bank at a risk for loss. Courts consistently analogize check kiting to theft rather than to a fraudulently granted loan. "The offender in a fraudulently induced loan transaction at least asked the bank to provide the funds and gave some kind of security in return." *Flowers*, 55 F.3d at 221; *see also United States v. Frydenlund*, 990 F.2d 822, 826 (5th Cir.) ("The bank . . . voluntarily places a limit on its risk when it lends money, but it is at the mercy of the check kiter for the amount of loss he may cause."), *cert. denied*, 510 U.S. 868, 928 (1993). HUB was at risk that the substantially overdrawn balance on any particular day would not be recovered. *See Swanson*, 360 F.3d at 1164 ("Mr. Swanson's conduct put the bank at a risk of loss equal to the sum of his bank accounts' overdrafts each day . . . ."). The fact that HUB charged overdraft fees and interest on overdrawn balances does not change the risk of loss. *See United States v. Stone*, 954 F.2d 1187, 1193 (6th Cir. 1992) ("OCB's

assessment of a service charge did not in any sense confer a right upon [the defendant] to engage in the otherwise illegal activity of check kiting."); *United States v. McKinney*, 822 F.2d 946, 949 (10th Cir. 1987) ("[The bank] was unquestionably a victim of the scheme despite the fact that interest may have been paid on the uncollected funds.").

In a related argument, the defendants argue that they could not have defrauded HUB because the bank was aware of the numerous and sizable overdrafts and consented to them. However, it "is not a defense to the charge that [an account holder] colluded with [a bank officer] to commit bank fraud. 'It is the financial institution itself-not its officers or agents-that is the victim of the fraud [§ 1344] proscribes.'" *United States v. Waldroop*, 431 F.3d 736, 742 (10th Cir. 2005) (quoting *United States v. Saks*, 964 F.2d 1514, 1518-19 (5th Cir. 1992)). *See also United States v. Rackley*, 986 F.2d 1357, 1361 (10th Cir.) ("Defendant confuses the notion of defrauding a federally insured bank with the idea of defrauding its owner or directors. . . . Thus, even if [a bank officer] knew the true nature of the loan transactions, the institutions could nevertheless be defrauded."), *cert. denied*, 510 U.S. 860 (1993).

The evidence revealed that Martell meticulously moved funds between the numerous accounts to avoid detection on the five-day overdraft report, which was reviewed by the Bank's upper management. If the bank had approved of the overdrafts, there would have been no need to move the funds to avoid the

17

five-day report. Thomas Shara, Senior Loan Officer and Executive Vice President, testified that he was unaware of the activity in the Abreu-related accounts, and he immediately halted the scheme and confronted Abreu when he learned of it. Further, Nieves exceeded his authority as vice-president of commercial lending by approving overdrafts greater in amount than he was authorized to approve. This evidence sufficiently supports the jury's conclusion that the scheme was intended to defraud the bank despite Nieves' dual role of involvement in and knowledge of the scheme and his position as a bank officer.

## C. Bank Fraud Jury Instructions

Abreu, Martell, and Nieves also challenge the district court's jury instructions on the bank fraud charge, which they allege limited the jury's ability to consider their defenses of good faith and lack of specific intent. "We exercise plenary review in determining whether the jury instructions stated the proper legal standard. We review the refusal to give a particular instruction or the wording of instructions for abuse of discretion." *Leahy*, 445 F.3d at 642 (internal marks and citations omitted). In so doing, "we consider the totality of the instructions and not a particular sentence or paragraph in isolation." *Id.* (internal marks omitted).

The Appellants do not challenge their ability at trial to admit evidence about HUB employees' knowledge of the overdrafts, the substantial fees earned by HUB on the

18

overdrafted accounts, and Abreu's repayment of the overdrawn balance when he was confronted about the scheme in June 2001. They argue, however, that the district court's jury instructions effectively instructed the jury that this evidence was irrelevant, denying them a meaningful opportunity to present their defenses of acquiescence, receipt of fees, and repayment of the overdraft as they related to the complete defense of good faith.

Read as a whole, the jury instructions did not deny the defendants their requested defense of good faith, but accurately reflected the law and appropriately informed the jury of the relevance of the evidence. The district court explicitly told the jury that good faith was a complete defense to bank fraud because good faith negated the element of intent to defraud required for a bank fraud conviction (Appellant Abreu's App. at 1165-66), and that the Government bore the burden of proving beyond a reasonable doubt that the defendants acted with the requisite intent to defraud, negating a good faith defense (*id.* at 1167). The court further instructed the jury that "even if a bank officer or employee may have known the true nature of the questioned transaction, that is not a defense to bank fraud. Rather, the question is whether the financial institution itself, not its officers or agents, was defrauded." (*Id.* at 1170.) As noted above, this is a correct statement of the law. *See Waldroop*, 431 F.3d at 742. Taken together with the instruction that "[i]n determining whether or not the prosecution has proven that a defendant acted with the specific intent required by the mail and bank fraud counts, the jury must consider all of the

19

evidence received in the case bearing on a defendant's state of mind" (Appellant Abreu's App. at 1166), the instructions allowed the jury to consider the bank officials' knowledge and acquiescence in determining whether the defendants intended to defraud HUB, while properly instructing the jury that the defendants' intent to defraud must target the bank, not the individual bank officers.

The court also properly instructed the jury that repayment of the overdrafted balances could be considered in determining whether the defendants acted with an intent to defraud or whether they acted in good faith, focusing on the intent of the defendants at the time of the actions alleged to be fraudulent. The court's instruction that "[a]ctual repayment to the bank may negate an intent to defraud the bank only if coupled with other evidence that likewise negates an intent to defraud" (*id.* at 1170) correctly states the law and appropriately focuses the jurors' attention on the defendants' intent at the time of the charged conduct. *See United States v. Abboud*, 438 F.3d 554, 594 (6th Cir.) ("[T]he fact that Defendants repaid the kited amount after detection does not reduce their culpability."), *cert. denied*, 127 S. Ct. 446 (2006).

Likewise, the court properly instructed the jury that fees and interest charged by the bank on the overdrafts do not negate a defendant's intent to defraud, which is the focus of a bank fraud charge. *See id.* at 593 ("[T]he imposition of a service fee [does] not amount to an authorization of check kiting."). Bank

20

fraud requires only that the defendants put the bank at a risk of loss, not that the bank actually suffers a loss. *See United States v. Khorozian*, 333 F.3d 498, 505 & n.6 (3d Cir.) ("That [the bank] never actually suffered harm is also immaterial to [the defendant's] defense. Section 1344 only requires that the bank be placed at risk of loss."), *cert. denied*, 540 U.S. 968 (2003). This instruction, coupled with the instructions on knowledge and intent to defraud, allowed the defendants to argue that they believed their actions were authorized from the fact that they paid the overdraft fees and therefore lacked the requisite intent to defraud. The fact that the jury did not buy into their argument does not make the instructions erroneous.

**D.     Limitations on Cross-Examination of Government Witness**

Abreu, Martell, and Nieves next challenge the district court's limitation of their attempts to cross-examine a HUB employee concerning a consent agreement that HUB entered into with the FDIC in an unrelated matter. We review the denial of the Appellants' Sixth Amendment challenge for an abuse of discretion. *United States v. Williams*, 464 F.3d 443, 448 (3d Cir. 2006). While the Confrontation Clause guarantees a criminal defendant the right to confront witnesses on cross-examination, "a district court retains 'wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about . . . harassment, prejudice, confusion of the issues, the witness'

21

safety, or interrogation that is repetitive or only marginally relevant.'" *United States v. Tykarsky*, 446 F.3d 458, 475 (3d Cir. 2006) (quoting *United States v. Mussare*, 405 F.3d 161, 169 (3d Cir. 2005), *cert. denied*, 126 S. Ct. 1432 (2006), some internal marks omitted).

Through the cross-examination of Ms. Brown, a regulatory compliance officer for HUB called by the Government to testify primarily as a records custodian, the Appellants sought to show that HUB had a motive to cooperate with the Government in the Abreu investigation because HUB was being investigated by the state district attorney in another totally unrelated matter. The district court did not abuse its discretion in limiting the cross-examination of Ms. Brown. The unrelated investigation occurred years after the investigation of the actions at issue here with which HUB cooperated, and Ms. Brown testified that she had little knowledge of the other investigation. The marginal relevance and the risk of delay and confusion created by a mini-trial to explain the evidence support the district court's decision to limit the cross-examination. *See* Fed. R. Evid. 403 ("[R]elevant[] evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice [or] confusion of the issues, . . . or by considerations of undue delay . . . ."); *United States v. Ellis*, 156 F.3d 493, 498 (3d Cir. 1998) (finding no abuse of discretion where district court limited cross-examination of agent whose direct testimony was limited to authenticating tape recordings despite defendant's claim that witness had bias to avoid criminal

22

prosecution).

**E.    Confrontation Clause Challenge to Documentary Evidence**

The Confrontation Clause prohibits the "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004). It is not enough that the evidence falls within a hearsay exception for it to be admissible in a criminal trial; if the evidence is testimonial, it must also comply with the Confrontation Clause's requirements of unavailability and a prior opportunity for cross-examination. *Id.* at 51 ("*[E]x parte* examinations might sometimes be admissible under modern hearsay rules, but the Framers certainly would not have condoned them."). On the other hand, nontestimonial statements do not violate the Confrontation Clause and are admissible as long as "they are subject to a firmly rooted hearsay exception or bear an adequate indicia of reliability." *Albrecht v. Horn*, 485 F.3d 103, 134 (3d Cir. 2007) (noting that *Ohio v. Roberts*, 448 U.S. 56 (1980), continues to control nontestimonial statements after *Crawford*).

Abreu, Martell, Jimenez, and Giunta claim that the admission of documentary evidence related to the residential and commercial loan fraud counts violated the Confrontation Clause. The residential loan fraud charges involved thirty loans, and the

23

commercial loan fraud charges involved ten loans. The Government introduced documentary evidence related to each of the loans, including bank statements and either tax returns or IRS tax abstracts for each borrower. Only six borrowers testified in person at the trial related to their loan files. Of the forty loans involved in the two conspiracies, the Government introduced no testimony from any witness with regard to ten of those loans and relied solely on bank records and tax returns to make its case.

The Appellants challenge the admission of two types of documentary records as violating their Confrontation Clause rights: (1) declarations by records custodians used to authenticate bank statements of individual borrowers, and (2) transcripts of IRS records or certified copies of tax returns of individual borrowers obtained from the IRS. They do not challenge the Mortgage Pros loan files themselves, which were introduced through a live witness.

### 1.    Declarations of Records Custodians

The Government introduced bank statements from various banks which held accounts for individuals who used Mortgage Pros' services to obtain a mortgage. The Government used the bank statements to demonstrate that the borrower's loan application contained false information. The bank statements were introduced as business records of the relevant bank under Federal Rule of Evidence 803(6) and were authenticated with

24

sworn declarations under Rule 902(11). The Appellants do not challenge the information contained in the bank statements as hearsay, agreeing that the bank statements themselves are not testimonial and fall within the business records exception, but challenge only "the testimonial statements in the certifications used to lay the foundation for their admission." (Abreu Br. at 88.) They claim that Rule 902(11) violates the Sixth Amendment's Confrontation Clause as applied to criminal defendants who do not have a chance to cross-examine the certification declarant under *Crawford*.

Business records are admissible as an exception to the hearsay rules if the records were "made at or near the time by . . . a person with knowledge, if kept in the ordinary course of a regularly conducted business activity, and if it was the regular practice of that business activity to make" the records. Fed. R. Evid. 803(6). The custodians of the bank statements did not testify in person that the bank statements met the prerequisites for admission as a business record under Rule 803(6), but instead submitted affidavits attesting that these prerequisites were met as allowed by Rule 902(11).

We need not determine today whether the declarations admitted under Rule 902(11) to authenticate the bank statements at issue here under Rule 803(6) are "testimony" and therefore subject to the Confrontation Clause under *Crawford*.[2] Even

---

[2]The Seventh Circuit has answered this question in the negative. *See United States v. Ellis*, 460 F.3d 920, 927 (7th Cir. 2006) (holding that a Rule 902(11) certification of medical records was not testimonial, noting that the court did "not find as controlling the fact that a certification of authenticity under

25

assuming, without deciding, that the Rule 902(11) declarations are testimonial and subject to the Confrontation Clause, their admission in this case for the purpose of authenticating the bank statements was harmless.

The erroneous admission of testimonial hearsay in violation of the Confrontation Clause is "'simply an error in the trial process itself' . . . [that] we may affirm if the error was harmless." *United States v. Hinton*, 423 F.3d 355, 361-62 (3d Cir. 2005) (applying harmless error analysis to a Confrontation Clause challenge); *see United States v. Lore*, 430 F.3d 190, 209 (3d Cir. 2005) (considering whether an error was harmless beyond a reasonable doubt). "An evidentiary error is harmless only if it is highly probable that the improperly admitted evidence did not contribute to the jury's judgment of conviction." *United States v. Lopez*, 340 F.3d 169, 177 (3d Cir. 2003) (internal quotation and marks omitted). The Supreme Court has directed us to consider numerous factors in assessing whether the erroneous admission of testimonial evidence in violation of the Confrontation Clause was harmless to the defendant, including the importance of the testimony to the Government's case, the cumulative nature of the evidence, the existence of corroborating evidence, the extent of cross-examination allowed in the case, and the strength of the Government's case as a whole. *See Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986).

Each Rule 902(11) declaration covered numerous

_____

902(11) is made in anticipation of litigation. What is compelling is that *Crawford* expressly identified business records as nontestimonial evidence.").

business records of a particular bank, including both loan files and bank statements. Importantly, Appellants do not contest now, nor did they contest at trial, the validity of any of the statements contained in the Rule 902(11) declarations as related to the underlying bank statements that are the subject of this appeal. The defendants originally objected to the Rule 902(11) declarations as they related to the loan files, asserting that the loan files included documents from third-party sources outside of the knowledge of the bank document custodian. When the objections were made at trial, however, the defendants were primarily concerned with their inability to cross-examine the borrowers, not the document custodians. To the extent they sought to cross-examine a document custodian, it was for purposes of asking whether the custodian had verified the authenticity of signatures on loan documents with the purported author. At no time did the defendants ever challenge the declarations as they related to the bank statements.

As they pertained to the bank statements, the declarations merely stated that the bank statements were made at or near the time of the occurrence of the matters contained in the bank statements by someone with knowledge of the matters, that the bank statements were kept in the course of the regularly conducted activity of the bank, that they were made as a regular practice of the bank, and that any duplicates were accurate copies of the originals. (*See, e.g.,* Appellant Abreu's App. at 1878.) The defendants do not challenge now, nor did they contest at trial, the accuracy of these statements as related to the bank statements. The declaration that the bank statements were kept in the ordinary course of the banks' businesses did not add to the Government's case against the defendants for submitting false loan applications. It was the information contained in the

27

bank statements themselves, which is not contested on appeal, that the Government relied upon to make its case. The authenticity of the bank statements has never been challenged,[3] and the admission of the statements contained in the Rule 902(11) Certifications as related to the bank statements simply had no effect on the verdict. *Cf. United States v. Reifler*, 446 F.3d 65, 87 (2d Cir. 2006) (holding the admission of plea allocutions of codefendants to be harmless against a *Crawford* challenge where the Government did not emphasize the allocutions, which were used only as corroboration for other evidence showing the existence of an enterprise in a RICO case); *Government of Virgin Islands v. Joseph*, 964 F.2d 1380, 1389 (3d Cir. 1992) (holding that the erroneous admission of a hearsay statement that identified the defendant as the shooter was harmless where the defendant never contested that he shot the gun, but claimed only that he shot in self-defense). Any *Crawford* violation in admitting the Rule 902(11) declarations for purposes of authenticating the bank statements was harmless beyond a reasonable doubt.

### 2.     Tax Returns and Tax Abstracts

The Appellants also challenge the abstracts and the tax returns that were obtained from the IRS and were admitted under Rule 803(8) as public records. The Appellants allege that the tax abstracts, as well as their self-authenticating attestations, contained testimonial hearsay subject to the Confrontation

---

[3]"Abreu is not challenging the authenticity *of the business records* on appeal; rather, he is challenging the admission of the Rule 902(11) Certifications as violating his Sixth Amendment rights." (Abreu's Reply Br. at 22.)

Clause. The Appellants further claim that the tax returns obtained from the IRS are not public records under Rule 803(8). Finally, they claim that admitting the tax abstracts and the tax returns, which they characterize as containing testimonial hearsay from the borrowers, also violated the Confrontation Clause.

We first address the argument that the district court violated *Crawford* by admitting Form 2866, the certifications from the IRS used to authenticate the tax abstracts,[4] also referred to as transcripts, without complying with the Confrontation Clause. IRS Form 2866 was used to provide the certification necessary to qualify the IRS abstracts for the self-authentication rules of Rule 803(8) and Rule 902(4). In Form 2866, an IRS agent attests that the attached transcript is a true and complete transcript of the records contained in that office for a particular taxpayer for a particular period of time. It is unclear from the record whether the defendants raised a proper *Crawford* objection to the Form 2866 Certifications themselves.[5] Even if

---

[4]The abstracts obtained from the IRS were on Form 4340, Certificate of Assessments, Payments and Other Matters, which is a computer generated form that reflects the taxes assessed to and paid by the taxpayer in a particular year.

[5]At trial, the defendants objected to admitting the IRS transcripts and tax returns based on their inability to cross-examine the borrowers to which the tax abstracts or returns referred or to cross-examine Mortgage Pros employees who had testified before the documents were offered into evidence. (Abreu's App. at 587-88.) These objections did not preserve a *Crawford* issue related to the certifications themselves. The only objection based on *Crawford* in response to attempts to

29

properly preserved, our analysis of the *Crawford* issue related to the certifications used to authenticate the tax abstracts is similar to our previous analysis related to the Rule 902(11) declarations. The only potential testimonial hearsay contained in the Form 2866 certifications involved statements by an IRS employee that the abstracts were the complete records of the IRS for the referenced individual and time period. Assuming without deciding that the Form 2866 certifications contained testimonial hearsay,[6] their admission without affording the defendants an opportunity to cross-examine the IRS employee making the statement was harmless. There was no challenge to the statements contained in the Form 2866 certifications, and the Appellants do not contest the veracity of those statements now. The specific facts contained in the certification–that the attached abstracts were the complete records of the IRS–had no effect on the jury's verdict, and any erroneous admission of the Form 2866 certifications was harmless beyond a reasonable doubt. *See United States v. Iskander*, 407 F.3d 232, 240 (4th Cir. 2005) ("[A Confrontation Clause] error is harmless when the error did not substantially sway or substantially influence the [jury's

---

admit the Form 2866 Certifications, Form 4340 transcripts, or tax returns received from the IRS was an objection referencing a recent Law Journal article about the impact of *Crawford* on business records and raising "the possibility that these records may not be admissible with simply putting tax returns in based on *Crawford*." (Appellant Abreu's App. at 588.)

[6]*Cf. United States v. Weiland*, 420 F.3d 1062, 1077 (9th Cir. 2005) (holding that "a routine certification by the custodian of a domestic public record . . . and a routine attestation to authority and signature . . . are not testimonial in nature" for purposes of *Crawford*), *cert. denied*, 547 U.S. 1114 (2006).

verdict]." (internal quotations omitted)).

The Appellants' remaining challenges to the tax abstracts and the tax returns all fail because the abstracts and the returns are not hearsay at all, nor did they contain imbedded hearsay, because they were not offered for the truth of the matters asserted therein. *See* Fed. R. Evid. 801(c). The Government offered the information from the IRS, either in the form of a certified copy of the borrower's tax return as filed with the IRS or the transcript of the IRS's records of the borrower's return, for purposes of establishing that the tax return copies submitted with the loan applications were fabricated because they differed from the tax returns actually filed with the IRS. The Government established the misrepresentation element of the fraud counts by asking the jury to compare the "true" tax returns as filed, which were established by the returns or abstracts received from the IRS, with the copies of tax returns contained in the loan files. (*See* Abreu's Reply Br. at 16 (highlighting in the record where the Government asserted that the returns were "the true returns").) The tax returns were "true" in the sense that they were the returns that were actually filed with the IRS. There is a distinct and critical difference between the "true returns" and the borrower's "true income." The Government did not use the tax returns for the truth of the matter asserted in the tax returns or the abstracts, namely the taxpayer's "true income," but only to establish that the tax returns contained in the loan files and submitted to the lenders were not the same as the returns actually filed with the IRS. It mattered not what the specific amount of income reflected in either return was, only that the tax returns submitted with the loan applications were not copies of the actual tax returns submitted to the IRS.

31

Nonhearsay use of evidence as a means of demonstrating a discrepancy does not implicate the Confrontation Clause. In *Tennessee v. Street*, the defendant claimed that his confession to a murder was coerced by the sheriff, who allegedly read to the defendant an accomplice's previous confession and ordered the defendant to confess in a similar manner. 471 U.S. 409, 411-12 (1985). The Government introduced the accomplice's out-of-court statement for purposes of showing discrepancies between the two confessions in an attempt to discredit the defendant's claim that his confession was coerced. The Supreme Court reversed the Tennessee Court of Criminal Appeals' finding of a Confrontation Clause violation because "[t]he *nonhearsay* aspect of [the accomplice's] confession-not to prove what happened at the murder scene but to prove what happened when respondent confessed-raise[d] no Confrontation Clause concerns." *Id.* at 414.

Similarly, the actual truthfulness of what the tax returns as filed and the abstracts said was irrelevant to the jury's determination of whether the Appellants made false representations to the lenders by providing them with fabricated tax returns; the relevant point was that the copies of the tax returns used to support the loan applications were fabricated. Introduction of the tax returns as actually filed and the tax abstracts for this nonhearsay purpose did not raise Confrontation Clause concerns. *See Crawford*, 541 U.S. at 60 n.9 ("The [Confrontation] Clause . . . does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." (citing *Street*, 471 U.S. at 414))*; Lore*, 430 F.3d at 209 ("[T]estimonial statements are admissible without prior cross-examination if they are not offered for their truth.").

32

### III. Jimenez's Separate Non-Sentencing Issues

#### A. Sufficiency of the Evidence

Jimenez challenges the sufficiency of the evidence to support his mail fraud conviction on Count 4 related to a loan referred to as the Diaz loan. We review *de novo* the district court's denial of Jimenez's motion for acquittal based on a lack of evidence. Our review is nonetheless deferential to the jury verdict, and Jimenez faces a heavy burden, as "we must . . . consider the evidence in the light most favorable to the verdict and ask whether a reasonable jury could have found that the contested elements were proven beyond a reasonable doubt." *United States v. Hull*, 456 F.3d 133, 141 (3d Cir. 2006) (internal marks omitted), *cert. denied*, 127 S. Ct. 2877 (2007). "Appellate reversal on the grounds of insufficient evidence should be confined to cases where the failure of the prosecution is clear." *United States v. Carr*, 25 F.3d 1194, 1201 (3d Cir.) (internal marks omitted), *cert. denied*, 513 U.S. 939, 1086 (1994).

The elements of mail fraud under 18 U.S.C. § 1341 include: "(1) a scheme to defraud; (2) use of the mails to further that scheme; and (3) fraudulent intent." *United States v. Pharis*, 298 F.3d 228, 234 (3d Cir. 2002). While individual mailings may constitute separate substantive mail fraud counts, they need not be separate schemes. *See United States v. Massey*, 48 F.3d 1560, 1566-67 (10th Cir.), *cert. denied*, 515 U.S. 1167 (1995). A mailing can support a substantive mail fraud conviction even if the mailing itself is not fraudulent as long as it furthers the fraudulent scheme. *See Schmuck v. United States*, 489 U.S. 705, 715 (1989) ("The relevant question at all times is whether the

33

mailing is part of the execution of the scheme as conceived by the perpetrator at the time.").

Jimenez was a loan processor at Mortgage Pros. He claims that the evidence admitted at trial was insufficient to establish that the loan application for Pedro and Aida Diaz that was mailed to the financial institution that approved the loan for them was fraudulent. The only evidence at trial specific to the Diaz loan was (1) the loan file itself, which consisted of documentation submitted to the bank for approval–a loan application, two Verification of Employment (VOE) forms, a W-2 form, a pay stub, and a tax return; and (2) an IRS certified tax return for the Diazes for the 1994 tax year. The VOE dated February 25, 2004, and signed by Fernando Jimenez as the loan processor, stated that Pedro Diaz was employed by Paperworld Services, Inc. as a general manager and had earned $8,750 through February 25, 1994. The VOE form indicated that his probability of continued employment was "good." The VOE was purportedly completed by Peter Perez as vice president of Paperworld Services, Inc. The Diazes' certified tax return for 1994 listed two different employers for Pedro but did not include any income in 1994 from Paperworld Services. There was ample evidence at trial that Jimenez was integrally involved in the overall fraud conspiracy to provide fraudulent documents, including falsified VOE forms and W-2 forms, to enable Mortgage Pros' customers to obtain residential mortgages. Given this background evidence of the scheme, the discrepancy between the Diazes' certified tax return and the VOE forms relied upon by the lender to make the loan was sufficient evidence from which the jury could find that the documents related to the Diaz loan furthered the residential mortgage fraud scheme.

34

## B.    Misjoinder

Jimenez next claims that the district court erred in joining his claims with the other defendants under Federal Rule of Criminal Procedure 8(b).  The district court denied Jimenez's motions to sever based on both Rule 8(b) and on Rule 14.[7]  The appeal of a denial of a Rule 8 motion is a claim of legal error, which we review *de novo*.  *See United States v. Eufrasio*, 935 F.2d 553, 567 (3d Cir.), *cert. denied*, 502 U.S. 925 (1991).  "If we determine that counts were improperly joined, we must undertake a harmless error analysis to see if prejudice resulted.  Our inquiry into whether offenses or defendants were properly joined focuses upon the indictment, not upon the proof that was subsequently produced at trial."  *United States v. Irizarry*, 341 F.3d 273, 287 (3d Cir. 2003) (internal citation omitted), *cert. denied*, 540 U.S. 1140 (2004).

Joint trials of defendants named in a single indictment are favored because they "conserve state funds, diminish inconvenience to witnesses and public authorities, and avoid delays in bringing those accused of crime to trial."  *United States v. Lane*, 474 U.S. 438, 449 (1986) (internal marks omitted).  Nonetheless, joinder of defendants under Rule 8(b) is a stricter standard than joinder of counts against a single defendant under Rule 8(a).  It is not enough that defendants are involved in offenses of the same or similar character; there must

---

[7]Jimenez does not appeal the denial of his motion under Federal Rule of Criminal Procedure 14, which allows a district court to sever properly joined defendants and order a separate trial where a consolidated trial appears to prejudice the defendant.

exist a transactional nexus in that the defendants must have participated in "the same act or transaction, or in the same series of acts or transactions," Fed. R. Crim. P. 8(b), before joinder of defendants in a multiple-defendant trial is proper, *Irizarry*, 341 F.3d at 287 n.4. *See also Eufrasio*, 935 F.2d at 570 & n.20 (describing Rule 8(b) joinder of defendants as a "less permissive standard" than Rule 8(a) joinder of claims).

Whether Jimenez was properly joined under Rule 8(b) is a close question in this case. Jimenez was one of nine individuals named in a 47-count indictment, in which he was charged in only two counts: the residential loan mail fraud conspiracy count and one substantive mail fraud count. The indictment charged eight separate conspiracies, and each had some elements in common with the others. Although the Government may be able to link each of the conspiracies together one to another in a linear chain, it does not necessarily follow that all counts involved "the same series of acts or transactions." Fed. R. Crim. P. 8(b). Nonetheless, we need not decide whether Jimenez was improperly joined because even if he was, the error was harmless.

An error is harmless if it "does not affect substantial rights" of the defendant. Fed. R. Crim. P. 52(a). "[A]n error involving misjoinder 'affects substantial rights' and requires reversal only if the misjoinder results in actual prejudice because it 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Lane*, 474 U.S. at 449 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).

A review of the record reveals that there was overwhelming evidence that Jimenez was involved in the

residential loan mail fraud conspiracy. Two Mortgage Pros employees testified that they each personally witnessed Jimenez calculate false information and falsify documents when he processed loans. One testified that Jimenez used the "light box" to forge signatures on loan documents. They each testified that Jimenez expressed remorse over his involvement with the fraudulent activity before he quit working at Mortgage Pros because he planned to go to law school. Sanchez, a codefendant who pleaded guilty prior to trial, testified that upon Jimenez's request, he prepared false bank statements for Jimenez to use with loan applications Jimenez processed. A borrower testified that Jimenez explained to him how he could help him refinance his mortgage after he was rejected by his current bank by inflating his income, and that Jimenez provided a false W-2 and a false pay stub with inflated income figures in exchange for $500 in cash that the borrower paid directly to Jimenez. Documentary evidence showed Jimenez as the loan processor for loan applications containing false information.

We also note that the district court explicitly instructed the jury to consider each defendant and each count separately, specifically instructing the jury that particular evidence did not apply to Jimenez. The jury's verdict reflects that the jury was able to compartmentalize the evidence as to each defendant and each count as evidenced by the jury's acquittal on some counts and convictions on others. The limiting instructions, coupled with the "overwhelming evidence of guilt shown here, . . . satisfie[s us] that the claimed error was harmless." *Lane*, 474 U.S. at 450; *see also id.* at 450-51 n.13 (discussing the use of limiting instructions and noting that "overwhelming evidence" in this context requires a higher threshold than that needed to foreclose a sufficiency of the evidence claim).

37

## C. Admission of Rebuttal Evidence

We also must reject Jimenez's claim that the district court abused its discretion in allowing the Government to introduce evidence about a particular loan file for the first time on rebuttal that purportedly went beyond the scope of Jimenez's defense case. Jimenez does not contend that the evidence was inadmissible in and of itself under the Rules of Evidence or that it could not have been admitted during the Government's case in chief. "Even though the testimony could or should have been offered as part of the government's case in chief, the trial court's decision to allow it as rebuttal is not reviewable in the absence of gross abuse of discretion." *United States v. Chrzanowski*, 502 F.2d 573, 576 (3d Cir. 1974). "[I]t was clearly within the trial court's discretion to allow evidence of other [similar fraudulent acts] committed by appellants in order to rebut evidence discrediting the government's account of the crime . . . ." *Id.* We see no abuse of discretion, let alone the gross abuse the cases require.

## D. Prosecutorial Misconduct

Finally, Jimenez appeals the district court's denial of his motion for a mistrial based on prosecutorial misconduct stemming from the Government's questioning of a defense investigator during which the Government suggested that the witness, as well as Jimenez's counsel, violated ethical rules by approaching a prosecution witness known to be represented by counsel. The district court found the Government's questioning to constitute a personal attack on Jimenez's counsel and, after a lengthy discussion with all of the parties, directed Government counsel to make a statement to the jury apologizing for any

38

suggestion that either Jimenez's counsel or the investigator violated an ethical rule. In fact, the district court dictated the actual words to be used in the apology, which were approved by the defense counsel collectively. The district court also struck, at the request of the defense counsel, the line of questioning the Government counsel had been posing to the investigator about her attempts to interview the witness.

Although the district court's action was not in keeping with our later suggestion as to how such matters should be handled, *see United States v. Korey*, 472 F.3d 89, 97 (3d Cir. 2007), the district court's careful composition of the agreed upon statement dampens our concerns, prevented the government counsel from making the kind of self aggrandizing speech we found objectionable in Korey, and helped cure the improper line of questioning. In any event, after a careful review, we cannot say that the district court abused its discretion in denying Jimenez's motion for a mistrial. *See United States v. Young*, 470 U.S. 1, 11 (1985) ("[A] criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial."); *United States v. Zehrbach*, 47 F.3d 1252, 1267 (3d Cir.) (holding that the district court's curative instructions cured the Government's "truly improper and unfortunate" comments), *cert. denied*, 514 U.S. 1067 (1995).[8]

---

[8]Judge Smith concurs in this opinion in its entirety, but offers this footnote in lieu of a separate concurrence:

Our conclusion that the district court did not abuse its

39

## IV. Sentencing Issues

### A.       Abreu's Sentencing Challenge

Abreu challenges the district court's application of the Sentencing Guidelines that ultimately resulted in his 87-month sentence.  After *United States v. Booker*, 543 U.S. 220 (2005), we "continue to review factual findings relevant to the Guidelines for clear error and to exercise plenary review over a district court's interpretation of the Guidelines."  *United States v. Grier*, 475 F.3d 556, 570 (3d Cir.) (en banc), *cert. denied*, 2007 WL 1539300 (Oct. 1, 2007).  "A finding is clearly

discretion by denying the motion for a mistrial by no means suggests that I approve of the practice employed here.  An apology offered by counsel to the jury before it has rendered its verdict is problematic regardless of who authored the text of the apology, and regardless of whether the apology is meant to address either the attorney's own shortcomings or to erase a suggestion that opposing counsel acted inappropriately during the pendency of the case.  I take this opportunity to reiterate *Korey*'s admonition that "district courts would be well advised to avoid such issues by restricting attorneys to a simple 'I'm sorry'-even one that is delivered after the verdict is rendered-when responding to questionable conduct."  472 F.3d at 97.  In the event a post-verdict apology may be inadequate to address aspersions cast upon opposing counsel, as occurred in this case, I believe that serious consideration should be given by the district court to addressing the issue directly with the jury.

erroneous when, although there is evidence to support it, the reviewing body on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Id.* (internal marks omitted). If the district court makes clearly erroneous factual findings in determining the applicable Guidelines range, the resulting sentence will generally be unreasonable and a remand will be required unless either the doctrines of plain error or harmless error apply to preserve the imposed sentence. *See id.*

The district court grouped all of Abreu's counts of conviction and started with a base offense level of 6, USSG § 2F1.1(a) (Nov. 2000),[9] added 13 levels based on the total loss amount from all of the conspiracies, USSG § 2F1.1(b)(1)(N), added 2 levels for more than minimal planning, USSG § 2F1.1(b)(2), added 4 levels for Abreu's role in the offense, USSG § 3B1.1(a), and added 2 levels for abuse of a position of trust, USSG § 3B1.3, for a total offense level of 27.

On appeal, Abreu challenges the amount of the loss from the Carvajal commercial loan based on the value of the property pledged to secure the loan. "In fraudulent loan application cases . . ., the loss is the actual loss to the victim (or if the loss has not yet come about, the expected loss)." USSG § 2F1.1, comment. (n.8(b)). At the time of sentencing, the loan had been in default for over five years, HUB had charged off a balance of $165,000 on the loan, the borrower had filed bankruptcy and the collateral was tied up in that proceeding, and HUB's priority on the

---

[9]Unless otherwise indicated, all citations to the U.S. Sentencing Guidelines Manual are to the 2000 version used by the district court at sentencing.

41

collateral was subordinate to another lender and to the bankruptcy trustee. The district court reduced the loss amount by the proceeds that HUB had received from the bankruptcy trustee by the time of sentencing, which was approximately $27,000, but it refused to reduce the loss amount further for any potential future recovery from the sale of the pledged real estate because of the speculative nature of any recovery.

"We have plenary review over the district court's refusal to give the defendants the claimed credits [for the collateral], but we review the court's factual findings for clear error." *United States v. Sharma*, 190 F.3d 220, 229 (3d Cir. 1999) (internal citations omitted). The Government bears the burden of establishing, by a preponderance of the evidence, the amount of the loss for purposes of the sentencing enhancement. *See United States v. Napier*, 273 F.3d 276, 279 (3d Cir. 2001), *cert. denied*, 535 U.S. 1066 (2002). Although the burden of persuasion remains with the Government, once the Government makes out a prima facie case of the loss amount, the burden of production shifts to the defendant to provide evidence that the Government's evidence is incomplete or inaccurate. *Geevers*, 226 F.3d at 193. The Government established a loss of $138,000,[10] before considering interest and costs, as of the time of the sentencing hearing. Given the conflicting evidence concerning the value of the collateral, HUB's subordinate position in collecting on the collateral, and the uncertainty of collecting from the bankruptcy proceeding that had been ongoing for several years, the district court did not clearly err in

---

[10]The loss consisted of the $165,000 principal balance charged off by the bank less the $27,000 received from the Bankruptcy trustee.

42

determining that HUB suffered a loss of approximately $138,000 as of the time of the sentencing hearing. *See* USSG § 2F1.1, comment. (n.9) ("The court need only make a reasonable estimate of the loss, given the available information."); *Napier*, 273 F.3d at 279-80 (finding no clear error where the parties submitted conflicting evidence and the district court found the Government's more reliable).

Abreu also challenges the inclusion of $132,000 of bargained-for interest related to the defaulted residential loans in the total loss amount, relying on a 2001 change in the Sentencing Guidelines commentary excluding "[i]nterest of any kind" from the loss calculation. *See* USSG § 2B1.1, comment. (n.2(D)(I)) (Nov. 2001);[11] USSG App. C. (Vol. II), Amendment 617, at 182-83 (Nov. 2003). Prior to that amendment, this court included bargained-for interest in calculating the loss in bank fraud cases. *See Sharma*, 190 F.3d at 228 ("We read Application Note 8 [of USSG § 2F1.1] as requiring the exclusion of opportunity-cost interest, but not bargained-for interest, from the valuation of the victim's loss.").

Sentencing courts generally apply the Guidelines in effect at the time of sentencing unless those Guidelines would expose the defendant to a sentence higher than the Guidelines in effect at the time of the crime, raising Ex Post Facto concerns. *See* USSG § 1B1.11(a), (b)(1); *United States v. Brennan*, 326 F.3d 176, 197 (3d Cir.), *cert. denied*, 540 U.S. 898 (2003). The district court used the 2000 Guidelines, in effect when the

[11]The 2001 amendment also consolidated the fraud guidelines previously contained in USSG § 2F1.1 into the theft and embezzlement guidelines contained in USSG § 2B1.1.

crimes were completed in June 2001, to calculate Abreu's sentence because amendments to the 2001 Guidelines significantly increased the enhancements related to the amount of the loss. Although the district court must use the entirety of the Guidelines Manual in effect, it nonetheless considers subsequent amendments to the Guidelines when the amendments are clarifying rather than substantive. USSG § 1B1.11(b)(2). The district court refused to consider the 2001 amendment excluding all interest from the loss calculation under USSG § 2B1.1, concluding that the amendment was substantive because it changed existing law under Third Circuit precedent. Abreu disagrees, relying on *United States v. Morgan*, 376 F.3d 1002 (9th Cir. 2004), which held that the amendment to Application Note 2(D) was a clarifying amendment because the prior definition was ambiguous and the amendment "resolve[d] a circuit conflict between two equally reasonable interpretations of the loss definition," *id.* at 1013-14.

We decline to decide whether the 2001 amendment was a clarification or a substantive change, because any error from including the interest in the loss determination was harmless. *See United States v. Lennon*, 372 F.3d 535, 541-42 (3d Cir. 2004) (declining to address as harmless a claimed error that, when corrected, would have resulted in the same sentencing range). Excluding the $132,051 in interest from the total loss of $2,729,192 would have resulted in the same 13-level enhancement for losses between $2.5 million and $5 million. Including the interest in the total loss calculation therefore did not affect Abreu's sentence and does not warrant a remand.

The fact that the interest is included in the restitution order is irrelevant to determining the loss amount for purposes

44

of USSG § 2F1.1, as restitution is determined under USSG § 5E1.1 (to which the application notes of § 2B1.1 do not apply), requiring the court to "enter a restitution order for the full amount of the victim's loss, if such order is authorized under . . . [18 U.S.C.] § 3663A." USSG § 5E1.1(a)(1). The "full amount of the victim's loss," particularly when the victim is a financial institution, includes bargained for interest and finance charges. *See Morgan*, 376 F.3d at 1014 (including interest in a restitution order even though it was excluded for purposes of calculating loss for purposes of USSG § 2F1.1); *Government of Virgin Islands v. Davis*, 43 F.3d 41, 47 (3d Cir. 1994) (allowing prejudgment interest on restitution order "to effect full compensation" for the victim's actual loss), *cert. denied*, 515 U.S. 1123 (1995); *United States v. Smith*, 944 F.2d 618, 626 (9th Cir. 1991) ("Foregone interest is one aspect of the victim [bank]'s actual loss, and thus may be part of the victim's compensation."), *cert. denied*, 503 U.S. 951 (1992). The district court therefore properly included the interest in the restitution order, and any error in including interest in the loss calculation for purposes of determining Abreu's advisory Guidelines range was harmless.

We summarily reject Abreu's claim that the district court should not have included in the loss calculation that portion of the defaulted residential mortgage loans covered by insurance proceeds. Receipt of insurance proceeds merely shifts the loss, it does not reduce it as would the recovery of property pledged to secure a loan. The loss to the insurance company is therefore a direct loss that was properly included within the loss calculations. *See United States v. Castellano*, 349 F.3d 483, 484 (7th Cir. 2003) ("[A] collateral source of recovery does not eliminate but just shifts the loss. If the buyers had purchased

45

insurance to protect themselves from fraud, their receipt of indemnity would not have absolved the wrongdoers."); *United States v. Alegria*, 192 F.3d 179, 191 (1st Cir. 1999) ("[I]nsurance simply shifts the loss to another victim (the insurance company), so it is irrelevant [that the insurer rather than the victim suffered the loss] in calculating the amount of loss for sentencing purposes.").

We likewise reject Abreu's argument that the losses on the residential loans should not include the defaulted loan balances because the Government failed to establish a nexus between the fraudulent loan documents and the defaults. "[I]t is not appropriate to reduce the amount of the loss, as computed under the Guidelines, in order to reflect other causes of the loss which were beyond the defendant's control. An intervening force that increases a fraud-related loss will not decrease the loss valuation but will only provide possible grounds for a downward departure." *United States v. Neadle*, 72 F.3d 1104, 1110 (3d Cir. 1995) (internal citations omitted), *amended by* 79 F.3d 14 (3d Cir.), *cert. denied*, 519 U.S. 895 (1996); *see also* USSG § 2F1.1, comment. (n. 8(b)) (explaining that a loss from a defaulted loan caused by an unforeseen event is included in the loss amount, although it may provide a basis for a downward departure). Abreu does not claim that the district court should have granted a departure based on the intervening circumstances that caused the individual borrowers to default. The district court appropriately included the defaulted loan balances in calculating the loss.

The district court properly calculated the loss from the check kiting scheme based on the net balance in the Abreu-related HUB accounts at the time the crime was detected. *See*

46

*Shaffer*, 35 F.3d at 114 ("[C]heck kiting crimes, because of their particular nature, are crimes where the district court must calculate the victim's actual loss as it exists at the time the offense is detected rather than as it exists at the time of sentencing."). The district court did not clearly err, based on the evidence submitted at trial, in determining the appropriate date of detection or the amount of the offsets used by the Bank to partially cover the overdrafts.

Abreu was convicted of conspiring to structure transactions as well as nine substantive structuring counts. The jury acquitted him of five substantive structuring counts. On appeal, Abreu argues that the district court violated his Fifth Amendment right to Due Process by considering the acquitted counts as relevant conduct in assessing the total loss from the structuring offenses. The court en banc recently addressed the issue of whether the Due Process Clause requires that facts relevant to sentencing enhancements, particularly facts related to a separate offense for which charges were ultimately dropped, must be proved beyond a reasonable doubt. *See Grier*, 475 F.3d at 561. We held that because "[f]acts relevant to application of the Guidelines-whether or not they constitute a 'separate offense'- . . . inform the district court's discretion without limiting its authority," reliance on those facts does "not implicate the rights to a jury trial and proof beyond a reasonable doubt." *Id.* at 567-68.

The same is true of acquitted conduct. *See United States v. Faust*, 456 F.3d 1342, 1348 (11th Cir.) (affirming sentence based in part on acquitted conduct in the face of a Due Process challenge), *cert. denied*, 127 S. Ct. 615 (2006). The counts of conviction determined Abreu's statutory sentencing exposure,

47

and the district court was free to consider relevant conduct, including conduct resulting in acquittal, that was proved by a preponderance of the evidence in determining Abreu's sentence within the original statutory sentencing range. We therefore reject Abreu's Due Process challenge to use of acquitted conduct in determining his sentence. Abreu does not contend that the Government failed to establish by a preponderance of the evidence that the losses from the acquitted counts were relevant to the convicted counts, and we thus reject his challenge on this ground.

Abreu argues that his 87-month sentence (imposed at the top of his 70-87-month advisory Guidelines range as determined by the district court) is *per se* unreasonable because of the errors of law he asserts the district court made in arriving at his advisory Guidelines sentencing range. We have examined above each of his Guidelines-based arguments and found them to be wanting. Accordingly, we also reject his argument that his resulting sentence is *per se* unreasonable. He makes no argument that his 87-month sentence is otherwise unreasonable when tested against the 18 U.S.C. § 3553(a) factors, and our independent review of the record discloses nothing that would render his sentence as imposed unreasonable after *Booker*.

## B.      Martell's Sentencing Issues

To the extent that Martell joins Abreu's sentencing issues, we incorporate our discussion of those issues here and deny Martell's challenges for the same reasons. We declined to rule on Abreu's claim that the district court should have considered the 2001 Amendment to USSG § 2B1.1 regarding inclusion of interest in the loss calculation because it would not have made

a difference in Abreu's sentence and was therefore harmless. The same is true for Martell, to whom the district court assigned the same loss amount.

Separately, Martell claims that the district court should not have attributed the full amount of the structuring conspiracy to her, arguing that, like Ms. Giunta, she should have been held responsible only for those counts on which she was convicted. The Guidelines direct the district court to consider as relevant conduct "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity" when sentencing a defendant involved in a conspiracy. USSG § 1B1.3(a)(1)(B). The trial evidence revealed that as the bookkeeper of several of Abreu's businesses, Martell was intimately involved in the financial activities of the businesses. The district court's conclusion that Martell was "at the hub of the Abreu enterprises" (Appellee's Suppl. App. at 216) was not clearly erroneous and supports its determination that the total amount of the structuring counts was reasonably foreseeable to Martell. *See United States v. Himler*, 355 F.3d 735, 740 (3d Cir. 2004) (standard of review); *United States v. Gricco*, 277 F.3d 339, 356 (3d Cir. 2002) (attributing loss arising from the total amount of money stolen by all of the participants to individual defendant).

## C.    Giunta's Sentencing Issues

As we did with Martell, we incorporate our discussion of the sentencing issues raised by Abreu here, and we reject Giunta's challenges that are based on the same arguments. As for the issue of including interest in the loss calculation upon which we declined to reach the merits based on the harmless

49

error doctrine, the doctrine applies to Giunta as well. The district court calculated the loss amount attributable to Giunta at $769,913, resulting in an upward adjustment of 10 levels for losses between $500,000 and $800,000, such that any error related to including the interest of $132,051in the total loss amount would have been harmless to Giunta.

Giunta separately argues that her role in the mortgage fraud conspiracies was not a proximate cause of the losses to the financial institutions, and that the intervening roles played by the closing attorney and the financial institution's own lending officers who granted the loans preclude a finding that she caused a loss in the residential loan mail fraud conspiracy to support an increase in her base offense level based on the amount of the residential loan fraud losses. In determining the loss amount for the fraud convictions under USSG § 2F1.1, the district court appropriately considered the losses that derived from the foreseeable acts of others in furtherance of the fraudulent scheme. *See* USSG § 1B1.3(a)(1)(B). It was certainly foreseeable to Giunta that others involved in the scheme, including the closing attorney, would submit fraudulent documents to the lending institutions. That the loan officers approved the loans based on a number of documents, more than one of which was fraudulent, does not remove Giunta's efforts from a position of proximately causing the loss that was ultimately suffered when the borrowers defaulted on the loans. *See United States v. Rennert*, 374 F.3d 206, 215 (3d Cir. 2004) (affirming attribution of entire conspiracy loss to individual defendant), *vacated in part on other grounds and remanded by* 544 U.S. 958 (2005); *United States v. Duliga*, 204 F.3d 97, 100-01 (3d Cir.) (same), *cert. denied*, 530 U.S. 1222 (2000); *see also Neadle*, 72 F.3d at 1110 ("[I]t is not appropriate to reduce

the amount of the loss, as computed under the Guidelines, in order to reflect other causes of the loss which were beyond the defendant's control.").

Having concluded that the district court calculated the correct Guidelines range of 21 to 27 months, Giunta offers no arguments that her 24-month sentence was otherwise unreasonable under 18 U.S.C. § 3553(a). We therefore affirm her sentence.

## D.    Nieves' Sentencing Issues

For the same reasons discussed in relation to Abreu's appeal, we reject Nieves' challenge to the loss amount attributed to the check kiting scheme.

Although Nieves does not otherwise challenge the district court's calculation of his applicable advisory Guidelines range, he claims that the district court improperly considered the remaining § 3553(a) factors in determining his ultimate sentence of 40 months. The district court chose a sentence below the middle of the applicable advisory Guidelines range of 37-46 months. We review the district court's ultimate sentence for reasonableness, which requires us to ensure that the district court gave "meaningful consideration" to the sentencing factors set out in § 3553(a). *United States v. Cooper*, 437 F.3d 324, 329 (3d Cir. 2006). If the district court gives due consideration to those factors, we give deference to its discretion in choosing the ultimate sentence. Our review is accordingly limited to determining "'whether the district judge imposed the sentence he or she did for reasons that are logical and consistent with the factors set forth in section 3553(a).'" *Id.* at 330 (quoting *United*

*States v. Williams*, 425 F.3d 478, 481 (7th Cir. 2005), *cert. denied*, 126 S. Ct. 1182 (2006)). Because Nieves' sentence is within the Guidelines range, it is less likely that it is unreasonable. *Id.* at 331; *see also Rita v. United States*, 127 S. Ct. 2456, 2463 (2007) (noting that "by the time an appeals court is considering a within-Guidelines sentence on review, both the sentencing judge and the Sentencing Commission will have reached the same conclusion as to the proper sentence in the particular case," which "increases the likelihood that the sentence is a reasonable one").

The district court discussed the § 3553(a) factors and considered the issues raised by Nieves, namely his prior service in the military and his strong family ties. Ultimately, however, the district court was led to its sentencing decision by the length of the conspiracy, the position of trust held by Mr. Nieves as a senior bank officer, and the seriousness of the offense based on the banking industry's reliance on officials in Nieves' position to maintain the integrity of the banking system. These are all proper factors to consider, *see* § 3553(a)(1), (2)(A), and are supported by the record.

Nieves relies on the sentence received by the defendant in *United States v. Ranum*, 353 F. Supp. 2d 984 (E.D. Wis. 2005), to argue that his sentence results in an unwarranted sentencing disparity. *See* § 3553(a)(6). Ranum, a commercial loan officer who exceeded his lending authority and caused over one million dollars in actual losses to his bank when a client's business failed, faced the same sentencing range as Nieves but received a sentence of one year and one day. That Nieves can find another case where a defendant charged with a somewhat similar crime and facing the same advisory sentencing range

52

received a sentence outside of the applicable sentencing range does not make Nieves' within-Guidelines sentence unreasonable. If that were the law, any sentence outside of the Guidelines range would set precedent for all future similarly convicted defendants. This is not, and cannot be, the law. Although a similar sentence might also be reasonable here, that does not make Nieves' sentence unreasonable. Reasonableness is a range, and our job is to ensure that the district court properly exercised its discretion by imposing a sentence within the range of reasonableness that is logically based upon, and consistent with, the § 3553(a) factors. *See United States v. Charles*, 467 F.3d 828, 833-34 & n.7 (3d Cir. 2006) ("[W]e will tolerate statutory sentencing disparities so long as a judge demonstrates that he or she viewed the Guidelines as advisory and reasonably exercised his or her discretion after applying the three-step sentencing process."), *cert. denied*, 127 S. Ct. 1505 (2007). The district court did so in this case, and we cannot say the resulting sentence is unreasonable.

We will affirm each of the Appellants' convictions and their sentences.