NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 11a0438n.06

No. 09-1021

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
*Jun 30, 2011*
LEONARD GREEN, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | ON APPEAL FROM THE |
| *Plaintiff-Appellee*, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| v. | ) | DISTRICT OF MICHIGAN |
| | ) | |
| FAWZI MUSTAPHA ASSI, | ) | **O P I N I O N** |
| | ) | |
| *Defendant-Appellant*. | ) | |

BEFORE:  GIBBONS and WHITE, Circuit Judges; and OLIVER, Chief District Judge.[*]

**SOLOMON OLIVER, JR., Chief District Judge.**  Defendant-Appellant, Fawzi Mustapha Assi ("Assi" or "Appellant"), appeals his sentence by the district court to 120 months in prison and 2 years of supervised release for providing material support to a foreign terrorist organization, in violation of 18 U.S.C. § 2339B.  Specifically, he argues that the district court should not have applied the sentence enhancement found in United States Sentencing Guideline § 3A1.4, which applies when an offense is considered a federal crime of terrorism.  For the following reasons, we **AFFIRM** Assi's sentence.

## I.  FACTUAL AND PROCEDURAL HISTORY

After receiving a Foreign Intelligence Surveillance Act Order permitting the Federal Bureau of Investigation ("FBI") to intercept calls on Assi's phones on February 2, 1998, FBI agents

---

[*] The Honorable Solomon Oliver, Jr., Chief Judge of the United States District Court for the Northern District of Ohio, sitting by designation.

monitored Assi's activities.  The FBI suspected that Assi would attempt to leave for Lebanon with prohibited items on July 13, 1998.  On that day, United States Customs officers stopped Assi at the airport and discovered two Boeing global positioning satellite systems, night vision equipment, and a thermal imaging camera in Assi's luggage.  Assi remained in the United States, and the FBI continued to monitor him.  The day after Assi was stopped at the airport, he was seen throwing items into two dumpsters.  Federal agents retrieved the items, which included: (1) a computer printout of addresses of ministries and various departments of the Israeli government; (2) an article entitled, "Charge Particle/Force Field Generator;" (3) an edition of U.S. News and World Report with the cover story of "The Mind of an Assassin, Israel's Enemies Within;" (4) an edition of Popular Science magazine with the cover story of "Digital Warrior;" (5) an edition of Popular Mechanics magazine, in which sections of an article entitled, "Felon Busters," were highlighted; (6) photographs of a person who appeared to be Hassan Nasrallah, who was the Secretary General of Hizballah; and (7) a course catalogue for "Radar Cross Section/Stealth Technology."  On July 17, 2008, the FBI searched a former residence of Assi and found three additional sets of night goggles.  FBI agents interviewed Assi on July 17, 1998, and July 21, 1998.

As a result of this investigation, Assi was arrested on July 23, 1998, on a complaint that charged him with violations of: (1) 18 U.S.C. § 2339B, attempting to provide material support or resources to a designated foreign terrorist organization; (2) 22 U.S.C. § 2778, 22 C.F.R. § 127.1, attempting to export a defense article without a license or written approval; and (3) 50 U.S.C. § 1705, 15 C.F.R. § 774, attempting to export an article without a license or written approval.  Assi was released on bond, and he fled to Lebanon, where he remained until May 2004.  He was apprehended upon his return and has been in custody since.  In the meantime, on August 4, 1998,

a federal grand jury returned an Indictment against Assi, charging him with the three offenses in the complaint as well as a charge of failure to appear, in violation of 18 U.S.C. § 3146.

On November 28, 2007, Assi pled guilty to count one of the Indictment, namely that he provided material support to a designated foreign terrorist organization, in this case Hizballah,[1] in violation of 18 U.S.C. § 2339B(a)(1). The plea agreement contemplated that the district court would decide whether the terrorism enhancement of the Sentencing Guidelines, USSG § 3A1.4 ("Terrorism Enhancement" or "§ 3A1.4"), should apply prior to sentencing. The district court conducted an evidentiary hearing on June 23, 2008 ("Hearing" or "Evidentiary Hearing"). Although Appellant was permitted to address the court himself to make an oral motion requesting that the district judge recuse himself, Appellant was also represented by counsel at the Hearing.

Special Agent Joseph Testani, Immigration and Customs Enforcement Special Agent Michael Steinbach, and FBI Special Agent Terrence Morisi, testified at the Hearing on behalf of Appellee and about the facts and circumstances of the criminal investigation of Appellant. Professor Augustus Richard Norton ("Professor Norton"), a professor who has extensively studied Hizballah, testified at the Hearing for the Appellant. He testified that Hizballah was a political and cultural organization that had a military component. He testified about how Hizballah participated in the Lebanese political process in 1992 and won 12 seats in the Lebanese Parliament. However, he also testified that although Hizballah was a "very immature organization" when it first formed in 1982, by 1998, it was "playing the leading role in the resistance" against Israel in southern Lebanon.

At the conclusion of the Hearing, the district court issued a written opinion, in which it found that § 3A1.4 applied. After this decision was rendered, Appellant filed a *pro se* Supplemental

---

[1]     Appellant refers to Hizballah as the "Resistance in Lebanon" in his filings.

Sentencing Memorandum, and a Motion for a Downward Departure.[2] Appellant also submitted two sets of *pro se* objections to the Presentence Report regarding the inclusion of the Terrorism Enhancement. On December 12, 2008, the district court sentenced Assi to a term of imprisonment of 120 months and 2 years of supervised release for attempting to provide material support or resources to a designated foreign terrorist organization. The other counts of the Indictment were dismissed.

## II. STANDARD OF REVIEW

The issue of whether a district court's sentence is reasonable is reviewed under a deferential abuse-of-discretion standard. *United States v. Mason*, 410 F. App'x 881, 885 (6th Cir. Dec. 15, 2010) (specifically addressing application of the Terrorism Enhancement); *United States v. Sexton*, 512 F.3d 326, 331 (6th Cir. 2008) (citing *Gall v. United States*, 552 U.S. 38, 46 (2007)). To determine whether the facts warrant an application of sentencing enhancement, however, this court applies a clearly erroneous standard. *United States v. Jackson-Randolph*, 282 F.3d 369, 390 (6th Cir. 2002) ("We conclude that the clear error standard is also appropriate for reviewing sentencing decisions under [Sentencing Guidelines] § 3C1.1 where the sole issue before the district court is a fact-bound application of the guideline provisions."). We review the district court's interpretation of the Sentencing Guidelines *de novo*. *United States v. Anthony*, 280 F.3d 694, 698 (6th Cir. 2002).

## III. LAW AND ANALYSIS

The Terrorism Enhancement, § 3A1.4, only applies to violations of 18 U.S.C. § 2339B where the evidence shows that the defendant provided support to a foreign terrorist organization with the intent "to influence or affect the conduct of government by intimidation or coercion, or to retaliate

---

[2] Appellant filed other *pro se* motions after the district court rendered a sentence, but they are not relevant to his appeal.

against government conduct." 18 U.S.C. § 2332b(g)(5)(A); *see also United States v. Hammoud*, 381 F.3d 316, 356 (4th Cir. 2004), *vacated on other grounds by* 543 U.S. 1097 (2005), *relevant portions reinstated by* 405 F.3d 1034 (4th Cir. 2005) ("[A] defendant who has been convicted of providing material support to [a] [Foreign Terrorist Organization] may be subject to the enhancement if the evidence establishes that he provided such support with the intent to influence or coerce government conduct.")  Therefore, it is possible to be guilty of providing material support to a foreign terrorist organization but not qualify for the Terrorism Enhancement.  This scenario would arise if the material support was not intended to influence or affect a government's conduct by intimidation or coercion.

USSG § 3A1.4 states, in relevant part:

> **(a)** If the offense is a felony that involved, or was intended to promote, a federal crime of terrorism, increase by 12 levels; but if the resulting offense level is less than level 32, increase to level 32.
> **(b)** In each such case, the defendant's criminal history category from Chapter Four (Criminal History and Criminal Livelihood) shall be Category VI.

Title 18 U.S.C. § 2332b(g)(5) defines "federal crime of terrorism."  It states, in relevant part:

> **(g) Definitions**.--As used in this section--
> . . .
> **(5)** the term "Federal crime of terrorism" means an offense that--
> > **(A)** is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct; and
> > **(B)** is a violation of--
> > > (i) . . . 2339B (relating to providing material support to terrorist organizations) . . .

## A.  The Legislative History of § 3A1.4

Appellant argues that the legislative history of  § 3A1.4 shows that Congress intended that the Terrorism Enhancement may apply to acts of violence, and he maintains that his conduct was not

violent. Appellant maintains that this interpretation is valid because interpreting the Guidelines and the definition of "federal crime of terrorism" in 18 U.S.C. § 2332b(g)(5) according to their plain meanings, would "lead[] to absurd results and shock[] the general moral and common sense." Appellee argues, in response, that words in § 3A1.4 should be given their plain meaning and that the plain meaning of the terms does not require that a federal crime of terrorism be violent.

This court has previously determined that, "[t]he [Sentencing] Guidelines should be interpreted as if they were a statute or a court rule, and we will 'follow the clear, unambiguous language if there is no manifestation of a contrary intent.'" *United States v. Lewis*, 900 F.2d 877, 881 (6th Cir. 1990) (quoting *United States v. Goldbaum*, 879 F.2d 811, 813 (10th Cir. 1989)). The "beginning point" for statutory construction is "the language of the statute, and when a statute speaks with clarity to an issue[,] judicial inquiry into the statute's meaning, in all but the most extraordinary circumstance, is finished." *Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 475 (1992). Moreover, "only the most extraordinary showing of contrary intentions from [the legislative history] would justify a limitation on the 'plain meaning' of the statutory language." *United States v. Garcia*, 469 U.S. 70, 75 (1984).

There are only two elements that must be met in order for an offense to be a federal crime of terrorism, and neither of those elements requires an act to be violent. First, the offense must be intended "to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." 18 U.S.C. § 2332b(g)(5)(A). Second, the offense must involve a violation of one of the crimes enumerated in 18 U.S.C. § 2332b(g)(5)(B). *See also United States v. Garey*, 546 F.3d 1359, 1361 (11th Cir. 2008) (per curiam). One of the enumerated crimes is providing material support to a terrorist organization. 18 U.S.C. § 2332b(g)(5)(B)(i). Not all of the

crimes listed in 18 U.S.C. § 2332b(g)(5)(B) are necessarily violent. In addition to the crime of providing support to a terrorist organization, other examples are "1030(a)(1) (relating to protection of computers)," "1030(a)(5)(A) resulting in damage as defined in 1030(c)(4)(A)(i)(II) through (VI) (relating to protection of computers)," "1361 (relating to government property or contracts)," and "1362 (relating to destruction of communication lines, stations, or systems)." Therefore, we must adhere to the plain language of the Terrorism Enhancement and 18 U.S.C. § 2332b. As a consequence, we find that a non-violent offense can be a federal crime of terrorism.

## B. The Definition of the Word "Government" in 18 U.S.C. § 2332b(g)(5)

In Appellant's Amended Brief, he maintains that "the word 'government' in 18 USC § 2332b(g)(5) cannot be logically interpreted to include the State of Israel . . . where Israel's army invaded the territorial integrity of Lebanon in violation of International Laws and occupied Lebanese territory in continued violation of International Law."

As a preliminary matter, a review of pertinent case law shows that the term "government" in 18 U.S.C. § 2332b(g)(5) includes foreign governments and therefore is not limited to acts against the United States. The court in *United States v. DeAmaris*, 406 F. Supp. 2d 748 (S.D. Tex. 2005), applied § 3A1.4(a) to the defendants who pled guilty to providing material support to United Self-Defense Forces of Colombia, which is a designated foreign terrorist organization that attempts to influence the government of Colombia. The court stated that, "the most reasoned approach to defining the word 'government' as used in § 2332b(g)(5)(A) is to define 'government' as including any government, foreign or domestic, and not to limit it to the United States government." *Id*. at 750. *See also United States v. Puerta*, 249 F. App'x 359, 360 (5th Cir.Oct. 2, 2007) (per curiam) (The court found that § 2332b(g)(5) applied to "Puerta and his co-conspirators [who] sought to trade

drugs and money for weapons to supply the United Self Defense Force[s] of Colombia, a designated foreign terrorist organization that opposes the Colombian government."). Similarly, the court in *United States v. Stewart*, 590 F.3d 93, 144 (2d Cir. 2009) (citation omitted), determined that § 3A1.4 applied to a defendant's conduct that was "calculated to affect the conduct of the Egyptian government though intimidation and coercion." *See also United States v. Aref*, No. 04-CR-402, 2007 WL 804814, at *2 (N.D.N.Y. Mar. 14, 2007) (applying § 3A1.4 to a defendant that contributed to a foreign terrorist organization attempting to kill a Pakistani ambassador).

As indicated above, Appellant "agrees that the definition of 'government' would ordinarily include the State of Israel." However, Appellant maintains that, by invading and remaining within the borders of Lebanon, the State of Israel can no longer be considered to be a government. Appellant further maintains that Israel's authority and jurisdiction do not extend beyond its own borders, so Hizballah's actions against Israeli forces within the borders of Lebanon cannot be considered actions against a legitimate government. In 1978, the United States expressed its opinion that Israel should withdraw from Lebanon. The United States voted in favor of United Nations Security Council Resolution 425, which, among other things, calls upon Israel to withdraw its forces from Lebanon. S.C. Res. 425, ¶ 2, U.N. Doc. S/RES/425 (Mar. 19, 1978). Therefore, Appellant's contention that Israel was acting illegally by continuing to occupy Lebanon is supported by the United Nations Security Council. Appellee maintains, in response, that nothing in § 2332b or the Sentencing Guidelines supports Appellant's argument and that Appellant was not acting on behalf of the Lebanese government.

We do not accept Appellant's assertion that Israel is no longer a "government" under 18 U.S.C. § 2332b(g)(5) because it is acting in contravention of international law by occupying

Lebanon. If we did, then a district court judge would be required to assess whether the country a foreign terrorist organization is trying to influence is acting illegally in some manner in order to determine whether the sentencing enhancement is appropriate. Surely Congress did not intend for a United States district court judge to determine whether a foreign state is complying in full with its international obligations before determining whether a person who has pled guilty to providing support to a foreign terrorist organization is subject to § 3A1.4. Appellant has provided no support for his argument that application of the Terrorism Enhancement should turn on whether an individual is opposing a government that does not meet its international obligations. The definition of what constitutes a terrorist act is simple and straightforward. As the court explained in *United States v. Christianson*, 586 F.3d 532, 539 (7th Cir. 2009), § 3A1.4

> looks at the crime involved and the perpetrator's motive. If the act is among the litany of crimes listed in § 2332B(g)(5)(B), which include a bevy of the most harmful and odious acts in the criminal code, including everything from murder and torture to the destruction of government property, and it was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct," then it is a federal crime of terrorism. *Id*. And for all intents and purposes at sentencing, that person is a terrorist.

Here, Appellant does not argue that his acts are not among the harmful acts prohibited or that his acts were not intended to coerce Israel. Therefore, his actions fall under § 3A1.4.

Appellant raises an alternative argument that if the term "government" includes a foreign government acting outside of its territorial borders in violation of another state's territorial integrity, then Appellant has been deprived of his due process right to fair notice that his conduct is a crime. Appellant relies on *Lambert v. California*, 355 U.S. 225 (1957), in support of this argument, which determined that a Los Angeles felon registration law was unconstitutional when applied to someone who was not given notice of the duty to register, and *United States v. Salisbury*, 983 F.2d 1369, 1378

(6th Cir. 1993), which found a voting law unconstitutionally vague as applied to the defendant in that case. We do not find this argument to be persuasive. Appellant had notice that contributing to Hizballah could result in application of the Terrorism Enhancement. The Terrorism Enhancement, by referring to "a federal crime of terrorism," is clear that it applies when a person acts with the intent to coerce a government. USSG, § 3A1.4(a); 18 U.S.C. § 2332b(g)(5)(A). Furthermore, Appellant was given notice by the district court that the Terrorism Enhancement might apply to his sentence when he pled guilty. The fact that Appellant believes that Israel should not deemed a "government" under 18 U.S.C. § 2332b(g)(5)(A) does not make the term "government" vague.

Therefore, upon *de novo* review, we find that the district court correctly determined that the term "government" includes the State of Israel. *See Anthony*, 280 F.3d at 698.

### C. The Terrorism Enhancement

Appellant argues that the facts of this case do not support the application of the Terrorism Enhancement. In support of this argument, Appellant maintains that "there has been no showing that his actions were a calculated effort to influence the conduct of a government by intimidation or coercion" and that "there has been no showing that [he] was acting to retaliate against conduct by a government." Appellant argues that his "argument as to the insufficiency of the evidence is predicated on the illegality of the Israeli conduct being legitimately resisted," as Hizballah is a legitimate resistence and political organization, not a terrorist organization.

In response, Appellee argues that the district court's determination that Appellant's actions were calculated to influence the conduct of Israel by intimidation or coercion was correct. Appellee notes that Appellant's expert, Professor Norton, who testified at the Hearing, stated that Hizballah's

military operations in the 1990s were designed to put pressure on and influence the Israeli government to withdraw forces from southern Lebanon.

The district court determined that Hizballah's actions against Israel were coercive because Hizballah conducted military operations against Israeli forces. *United States v. Assi*, 586 F. Supp. 2d 841, 849 (E.D. Mich. 2008) ("Plainly, such armed military offensives against Israeli troops qualify as 'coercion.'"). The Evidentiary Hearing transcript contains evidence supporting the district court's finding that Hizballah carried out military actions against Israeli forces. (*E.g.*, 6/23/2008 Hearing Tr., Dist. Ct. Dkt. 147, at pp. 176-77 (In 1998, Hizballah was "the most professional component of the resistance" against the Israeli Defense Force in Southern Lebanon.); *Id*., at p. 177 ("On the military level, I would say [Hizballah's] operations tended to be the best rehearsed, the most professional and so on."); *Id*., at p. 178 ("The typical attack [by Hizballah] would be on Israeli soldiers or thermal [sic] militia allies."); *Id*., at p. 181 (Norton explains how Hizballah has a political component and a military component.).) Moreover, Appellant stated in his Supplemental Sentencing Memorandum that "the material he provided was meant to support the resistance in south Lebanon in their armed conflict with the Israeli Defense Force." Appellant pled guilty to attempting to provide two Boeing global positioning satellite modules, night vision goggles, and a thermal imaging camera to Hizballah. We therefore conclude that it was not clearly erroneous for the district court to find that military actions are coercive in nature. *See Jackson-Randolph*, 282 F.3d at 390.

### D.  The Role of International Law

Appellant argues that, before determining that his actions promoted a federal crime of terrorism, the district court should have considered whether Appellant's assistance to Hizballah was justified under International Law. Appellant relies on three International Law doctrines: (1) the right

to self-defense pursuant to Article 51 of the United Nations Charter; (2) the Act of State Doctrine; and (3) the principle of comity. Appellee states, in response, that these International Law doctrines would apply only arguably if Hizballah were considered a part of or equivalent to the official government of Lebanon. Appellee maintains that Hizballah is not the Lebanese government and instead is an organization designated as a terrorist organization by the United States government.

We find that the international laws that Appellant cites are not relevant to this case, as all of the treaties and doctrines cited apply to states, not individuals. Appellant attempts to rely on the right to self-defense enshrined in Article 51 of the United Nations Charter. It is beyond dispute that Article 51's right to self-defense does not apply to an individual, but instead applies to states, or in limited circumstances, to self-determination movements that take on the legal obligations of states. U.N. Charter, Arts. 4, 51, 110; *Legal Consequences of the Construction of a Wall in the Occupied Palestinian Territory*, Advisory Op., 2004 I.C.J. 136, ¶ 139 (Jun. 9) ("Article 51 of the Charter thus recognizes the existence of an inherent right of self-defence in the case of armed attack by one State against another State.").

Appellant also argues that the Act of State Doctrine and the "international comity doctrine" prevented the district court from applying the Terrorism Enhancement. The Act of State Doctrine does not apply, as it bars only a United States federal court from judging the legality of an action taken by a foreign state within its territory. *Samantar v. Yousuf*, 130 S. Ct. 2278, 2290 (2010). In this case, the district court judged the legality of Appellant's actions, not Lebanon's. The doctrine of comity, which is comprised of nonbinding practices that states adopt out of courtesy, is also inapplicable to this case. As stated before, the issue of whether or not to apply the Terrorism Enhancement does not call into question the legality of Lebanon's resistence against Israel. The

district court only needed to determine whether Appellant's actions fell under 18 U.S.C. § 2332b, not whether Appellant's actions were justified or reasonable.

### E.  Jurisdiction

Finally, Appellant argues that Appellee does not have jurisdiction to adjudicate the Terrorism Enhancement because it has no "personal stake" in the litigation and has "suffered no injury as a result of Defendant's assistance to the Lebanese Resistance action."  Appellant argues that the Appellee must prove: (1) that "it has suffered an 'injury in fact';" (2) that "the injury is fairly traceable to the challenged action of the defendant;" and (3) that "it is likely . . . that the injury will be redressed by a favorable decision."  *Cleveland Branch NAACP v. City of Parma*, 263 F.3d 513, 523-24 (6th Cir. 2005).  In response, Appellee argues that Appellant's argument arises from civil cases, not criminal cases.  We reject Appellant's argument because it does not apply to criminal cases.  The decision whether or not to apply the Terrorism Enhancement does not require an analysis of whether the Appellee has standing.

### IV.  CONCLUSION

For the foregoing reasons, we **AFFIRM** Appellant's sentence and find that the district court appropriately applied the sentence enhancement found in United States Sentencing Guidelines § 3A1.4.