NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 14-1068
_____

UNITED STATES OF AMERICA

v.

SERGEY BOLTUTSKIY

Siarhei Baltutski a/k/a Sergey Boltutskiy,
                                        Appellant

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2-11-cr-00553-001)

District Judge:  Honorable Paul S. Diamond
_____

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
November 17, 2015

Before: AMBRO, HARDIMAN and SLOVITER, *Circuit Judges.*

(Opinion filed: December 7, 2015)

_____

OPINION*
_____

SLOVITER, *Circuit Judge*.

Sergey Boltutskiy appeals a final judgment of the District Court sentencing him to 180 months in prison for conspiring to illegally export night vision devices to Belarus. Boltutskiy argues that the harshness of his sentence is unsupported by the factual record and that his sentence is unreasonably disproportionate when compared to sentences imposed in similar cases.

We will affirm. The record contains ample support for the findings that the District Court relied upon in sentencing Boltutskiy. Moreover, he has not carried his burden to show that his sentence is unreasonably disproportionate.[1]

I.

A grand jury indicted Boltutskiy for conspiring with seven others to export night vision devices to Belarus and for laundering money to facilitate the illegal sale of these

_____

* This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

[1] Our decision to affirm obviates the need to consider Boltutskiy's argument that, if we were to remand for resentencing, we should assign this case to a different judge. Nevertheless, we note that there is no merit to Boltutskiy's argument that he was treated unfairly by the District Court. Although at times the Court may have expressed frustration with Boltutskiy's counsel, "judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge." *Liteky v. United States*, 510 U.S. 540, 555 (1994).

2

devices. These devices make weapons more accurate at night. Because the ability to shoot weapons accurately in the dark poses a serious threat to the military, it is illegal to export night vision devices without first obtaining a license. *See, e.g.*, 22 U.S.C. § 2778. Boltutskiy admitted to exporting night vision devices, but claimed that his purpose for doing so was to sell the devices to his Belarussian acquaintances who hunt pigs. The Government's investigation, however, uncovered evidence showing that Boltutskiy had facilitated or attempted to facilitate at least $749,000 in illegal sales, and that these sales were not limited to Belarussian acquaintances. This evidence included email correspondence with a prospective buyer in Russia who explained that he needed a night vision device for a Russian security service.

Boltutskiy eventually pleaded guilty to charges that he conspired to illegally export night vision devices in violation of 18 U.S.C. § 317 and 50 U.S.C. § 1705, and further, that he conspired to commit money laundering in violation of 18 U.S.C. § 1956(h).

Prior to sentencing, the U.S. Probation and Pretrial Services Office prepared a Presentence Investigation Report ("PSR") in which it concluded that Boltutskiy's base level sentencing range was 108 to 135 months. In arriving at this conclusion, the Pretrial Services Office applied a four-level upward adjustment because it found that Boltutskiy was responsible for organizing and leading the conspiracies for which he was convicted.

Boltutskiy objected to the PSR on several grounds. First, he maintained that he had exported the night vision devices solely for hunting purposes. Second, he denied the

3

Government's characterization of him as an international arms dealer. Third, he disclaimed knowledge of actions taken by his alleged co-conspirators. For its part, the Government requested that the District Court add three offense levels, which would result in a range of 151 to 188 months.

The District Court held an evidentiary hearing in advance of sentencing. At the hearing, the Government opposed Boltutskiy's objections to the PSR with testimony from several witnesses: (1) a U.S. Army Colonel, who testified as an expert about the security and safety threats posed by night vision devices; (2) a co-conspirator, who provided details about the conspiracy and Boltutskiy's role in leading it; and (3) a Special Agent with the Department of Homeland Security, who discussed evidence from the investigation into Boltutskiy's crimes. At Boltutskiy's request, the Court continued the hearing to allow him further time to call rebuttal witnesses.

When the hearing resumed, Boltutskiy presented testimony from the following witnesses: (1) friends from Belarus, who testified about their use of night vision devices while hunting; (2) an expert in night vision devices, who opined that the various devices sold by Boltutskiy would not be optimal for combat; and (3) Boltutskiy himself, who reiterated that pig hunting was the only purpose for which he intended the devices to be used.

At the close of the hearing, the Court overruled Boltutskiy's objections to the PSR, granted the Government's request for an upward variance, and sentenced Boltutskiy to 180 months in prison. In doing so, the Court emphasized the national security threat

4

created by the illegal export of night vision devices, Boltutskiy's lack of remorse, and the need for deterring conduct that jeopardizes the safety of American service members. The Court later issued a detailed order restating and elaborating on the reasons for its decision.

Boltutskiy timely appealed.

## II.

The District Court had jurisdiction pursuant to 18 U.S.C. § 3231. We have jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

## III.

Boltutskiy's first argument is that the Court should not have adopted the PSR's recommendation that he receive an upward adjustment for his role in leading the money laundering conspiracy. According to Boltutskiy, the Court never engaged in fact finding regarding whether he led the money laundering conspiracy; instead, he claims, the Court found only that he led the conspiracy to export night vision devices.

Boltutskiy concedes that he did not raise this issue before the District Court, and thus that we must review it for plain error. "Under this standard we must find that (1) an error was committed, (2) the error was plain, *i.e.*, clear or obvious, and (3) the error affected the defendant's substantial rights." *United States v. Knight*, 266 F.3d 203, 206 (3d Cir. 2001).

This argument fails under the first prong of the plain error test because the District Court did not err. Contrary to Boltutskiy's claim, the Court did in fact make findings on

5

the record about his role in the conspiracy and then based the upward adjustment on those findings. It applied a four-level upward adjustment, concluding that "the Government proved beyond a preponderance that Defendant headed the conspiracy." App. at 16. Although the Court did not initially specify the particular conspiracy to which it was referring, it continued: "The Government presented credible evidence that Defendant directed co-conspirators Yasev, Osin, Shapakovsky, Belski, Tsishuk, Stashynski, and Dubouskaya to purchase and export devices, and to transfer or wire funds to pay for the devices." App. at 16 (emphases added). Moreover, Boltutskiy's role in leading the money laundering scheme was among the reasons cited in the PSR for recommending the upward adjustment: "[t]he defendant provided money for the purchase of items, shipping fees, and commission fees for other participants . . . [and] directed others regarding what items should be purchased and how much money should be spent on the purchase of devices." PSR ¶ 57. By adopting the PSR's recommendations, the Court adopted its findings and based the upward adjustment on Boltutskiy's role in leading the money laundering conspiracy.

## IV.

Boltutskiy's second argument is that Court's imposition of a substantial upward variance was erroneous because it was based on unsupported factual findings. The Court's decision to impose an upward variance was based largely on three particular factual findings: (1) Boltutskiy exported a very large number of night vision devices; (2) the scope of his involvement in the conspiracy was broad; and (3) the conspiracy posed

6

serious safety and national security threats.  Boltutskiy argues that these three findings are unsupported by the record.

We review the District Court's factual findings for clear error.  *United States v. Jacobs*, 167 F.3d 792, 797 (3d Cir. 1999) ("Factual findings in relation to sentencing issues are reviewed for clear error.").  This standard of review is highly deferential and permits reversal only where the factual findings at issue are "completely devoid of minimum evidentiary support displaying some hue of credibility" or are without "rational relationship to the supportive evidentiary data."  *United States v. Antoon*, 933 F.2d 200, 204 (3d Cir. 1991) (quoting *Krasnov v. Dinan*, 465 F.2d 1298, 1302 (3d Cir. 1972)).  Here, the Government had the burden at sentencing to prove any disputed fact by a preponderance of the evidence.  *See United States v. Grier*, 475 F.3d 556, 568 (3d Cir. 2007).  As discussed below, the District Court's factual findings were not clearly erroneous.

A.

The first factual finding that Boltutskiy disputes is that the number of devices he illegally exported was "very large."  App. at 21.  He claims that the record does not support this characterization, and further, that the District Court was wrong when it stated that he exported "hundreds" of devices.  Appellant's Br. at 29-30.  He also argues that the Court erred by holding him responsible for "all" of the actions taken by his co-conspirators, as opposed to just those actions that were "reasonably foreseeable" in light of the conspiracy.  Appellant's Br. at 31-35.

7

The Court's finding was not clearly erroneous. When Boltutskiy pleaded guilty, he admitted the factual basis for the plea, which included the statement that he "conspired with fellow Belarussians to purchase and illegally export a large number of high-tech night-vision devices with military applications." Supp. App. at 9 (emphasis added). One of his co-conspirators testified that he shipped "[b]etween 75 and 100" night vision devices to Boltutskiy. App. at 133. Special Agent Zuchman provided testimony concerning itemized lists of specific sales that Boltutskiy was responsible for facilitating as part of the conspiracy. These lists include over a hundred devices collectively worth hundreds of thousands of dollars that Boltutskiy and/or his co-conspirators sold or attempted to sell. The Court found this evidence credible and additionally noted that, by pleading guilty to the conspiracy, Boltutskiy became responsible for the actions of his co-conspirators. Although it may have been an exaggeration to characterize the number of devices as in the "hundreds," the Court on two occasions during the hearing acknowledged that this number was likely in the "dozens." *See* App. at 195 ("Dozens, I will say dozens of these weapons."); 196-97 ("[W]hen I said hundreds, I misspoke. I will say dozens."). But even if it was erroneous to occasionally mention "hundreds" of devices, such a mistake is not a clear factual error that merits reversal under our deferential standard of review.

Finally, contrary to Boltutskiy's claim, the Court did not hold him responsible for "all" his co-conspirators' actions. Rather, in accordance with the Supreme Court's decision in *Pinkerton v. United States*, 328 U.S. 640 (1946), the District Court made clear

8

that Boltutskiy was responsible for the "reasonably foreseeable" consequences of the conspiracy. App. at 14-15 (quoting *United States v. Ramos*, 147 F.3d 281, 286 (3d Cir. 1998)). In sum, the Court's finding that Boltutskiy shipped a "very large" number of night vision devices is not clearly erroneous.

B.

The second factual finding that Boltutskiy disputes is that he could be fairly characterized as an "international arms dealer." App. at 20. According to the Court, this characterization is warranted because Boltutskiy purchased numerous night vision devices, arranged for their illegal export, wired money internationally, and facilitated sales of these devices in foreign countries. Boltutskiy claims the record does not support the finding that he was an international arms dealer.

The Court did not clearly err in so characterizing Boltutskiy. His argument to the contrary boils down to a dispute over whom the Court should have believed: Boltutskiy, who claimed he was exporting night vision devices for pig hunting; or the Government, who claimed he was exporting them for the broader purpose of profiting off the international black market. The Court plainly believed the Government, finding that it "presented considerable evidence to refute Defendant's absurd contention that he knowingly broke federal law and smuggled out three quarters of a million dollars in military grade, export-controlled hardware *solely* so he and his friends could sport hunt." App. at 18 (emphasis in original).

9

Ample evidence supports this factual finding. First, Boltutskiy pleaded guilty to knowingly violating federal law by exporting a large number of "night vision devices with military applications." Supp. App. at 9. Second, the Government's expert witness, Colonel McDonnell, provided testimony undercutting Boltutskiy's claim that the devices at issue would have been inappropriate for use in combat. Third, the Government presented emails exchanged between Boltutskiy and vendors in foreign countries other than Belarus showing that his export scheme was not limited to his friends. For example, Boltutskiy corresponded with a prospective Russian customer who stated, "I don't know you." Supp. App. at 77. He also corresponded with a prospective Russian customer who explained that he needed a particular device for "one of the support units of the CK," a term that refers to a Russian security service. App. at 358.

This evidence does not lose its persuasive weight merely because of testimony from Boltutskiy's expert, Dr. Ostromek, who testified that many of the night vision devices at issue were dual use items, *i.e.*, designed for both military and non-military uses. The fact that the devices could be used for hunting does not eliminate the security risk posed by the fact that they could also be used in combat. As such, the Court's characterization of Boltutskiy as an international arms dealer is not clearly erroneous.

C.

The third finding that Boltutskiy disputes is that his conspiracy to illegally export night devices posed a serious threat to our national security. The District Court found

10

that "serious harm . . . could result from the [night vision] devices falling into the hands of individuals whose interests are inimical to those of the United States." App. at 21.

The record contains extensive support for the Court's finding regarding national security. As Colonel McDonnell explained, the safety and efficacy of U.S. military operations depend on its superior night vision technology, which is one of its greatest tactical advantages. He expressed three concerns: "The first is that the devices fall into the hands of the enemies and they're used against our troops. Secondly is that countermeasures are developed to defeat the capabilities of the devices. And third is that the devices are taken apart, reverse engineered and then mass produced." App. at 76. As Special Agent Zuchman put it, "night vision devices, in the hands of the wrong people, take away the greatest capability of the Armed Forces of the U.S." App. at 174.

In seeking to undermine this evidence, Boltutskiy identifies particular features of the night vision devices at issue and argues that these features would make the devices useless in combat. For example, his expert, Dr. Ostromek, testified that the night vision devices at issue reflect light off their lenses and give off a traceable electronic signal. According to Boltutskiy, these features would dissuade hostile forces from using the devices in combat.

But even Dr. Ostromek acknowledged that, at a minimum, certain of these particular night vision devices would be better than having no devices at all. He also acknowledged that, at a minimum, they would be useful to adversaries lacking sophisticated night vision technology because the devices could be reverse engineered.

11

More importantly, the Court found Dr. Ostromek's testimony only partially credible. For example, the Court did not credit his testimony that the "monocular" night vision devices involved in the conspiracy would be useless to enemy combatants. App. at 333 ("I simply don't credit Dr. O[stromek]'s testimony that people use these monoculars simply to figure out where they are. I think they help them find targets whether they're mounted on guns or not."). Accordingly, the Court's finding that Boltutskiy's conspiracy presented a safety and security threat was not clearly erroneous.[2]

V.

Boltutskiy's third argument is that his 180-month sentence is disproportionately harsh, and thus, that it violates the principle that courts should "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). In support, he directs us to cases from a document published by the U.S. Department of Justice that showcases success stories in apprehending international smugglers, spies, and thieves.

To demonstrate an unreasonable sentencing disparity, Boltutskiy must carry the heavy burden of showing that his circumstances "exactly" paralleled the circumstances at

---

[2] There is no merit to Boltutskiy's related legal argument that the District Court could not rely on this safety and security threat in imposing an upward variance. It is true that the threat was already "built in" to the base level range. Appellant's Br. at 43-44 (citing U.S.S.G. § 2M5.2, Note 1). This, however, does not preclude the Court from giving further consideration to the sentencing factors under 18 U.S.C. § 3553(a). *See Koon v. United States*, 518 U.S. 81, 96 (1996) (noting that district courts can rely on factors already taken into account by the Guidelines if the factors are present in an "exceptional degree" or the case is otherwise "different from the ordinary case").

12

issue in other cases involving disparately lenient sentences. *United States v. Charles*, 467 F.3d 828, 833 n.7 (3d Cir. 2006). We "should not consider sentences imposed on defendants in other cases in the absence of such a showing by a party." *United States v. Vargas*, 477 F.3d 94, 100 (3d Cir. 2007), *abrogated on other grounds by United States v. Arrelucea-Zamudio*, 581 F.3d 142, 149 (3d Cir. 2009).

Boltutskiy has not carried his burden to show that his sentence is unreasonably disproportionate. Although his sentence is indeed harsh when compared to the cases he cites from the DOJ document, he has not shown that any of these cases are "exactly parallel" to his. For example, he cites a case where the defendant was convicted of violating a statute carrying a maximum penalty of twenty years. *See* Appellant's Br. at 56 (citing *United States v. Assi*, 428 F. App'x 570, 571 (6th Cir. 2011) (discussing penalty imposed under 18 U.S.C. § 2339B)). In contrast, Boltutskiy was convicted of violating three statutes that collectively carry a maximum penalty of forty-five years. Moreover, several of the specific cases he cites involve defendants who appear to have been apprehended before succeeding in their attempts to export prohibited technology, whereas in this case, Boltutskiy was found to have actually exported numerous night vision devices. And, as the Government points out, the base level sentencing range proposed by the Pretrial Services Office in this case—*i.e.*, before any upward variance— is higher than all but one of the sentences imposed in the specific cases cited by Boltutskiy.

We will "tolerate statutory sentencing disparities" as long as the District Court exercised its discretion reasonably and applied the Sentencing Guidelines correctly. *Charles*, 467 F.3d at 833. For example, in *United States v. Jimenez*, 513 F.3d 62 (3d Cir. 2008), a defendant received a forty-month sentence. *Id.* at 90. On appeal, he argued that his sentence was disproportionate in light of a similar case where the defendant received a twelve-month sentence. *Id.* We affirmed his sentence and emphasized that the mere citation of similar cases is not enough to demonstrate an unwarranted sentencing disparity: "This is not, and cannot be, the law. Although a similar sentence might also be reasonable here, that does not make [the defendant's] sentence unreasonable." *Id.* at 91. In accordance with this authority, the District Court in this case regarded the Guidelines as advisory, and then imposed Boltutskiy's 180-month sentence after a meaningful application of its discretionary authority to apply the § 3553(a) sentencing factors. Boltutskiy's sentence was not unreasonably disparate.

VI.

For the foregoing reasons, we will affirm the judgment of the District Court.